FILED

FEB 08 2018

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1  J. Noah Hagey, Esq. (SBN: 262331)
     hagey@braunhagey.com
2  Matthew Borden, Esq. (SBN: 214323)
     borden@braunhagey.com
3  BRAUNHAGEY & BORDEN LLP
    220 Sansome Street, Second Floor
4  San Francisco, CA 94104
    Telephone: (415) 599-0210
5  Facsimile: (415) 276-1808

6  Richard J. Rogers, Esq. (SBN: 189978)
     richardrogers@globaldiligence.com
7  GLOBAL DILIGENCE LLP
    Kemp House
8  152 City Rd
    London EC1V 2NX
9  UNITED KINGDOM
    Telephone: +44 (0)74 84822740

10

11  COUNSEL FOR APPLICANT SAM RAINSY

12           **UNITED STATES DISTRICT COURT**

13          **NORTHERN DISTRICT OF CALIFORNIA**

14

15  *In re* Ex Parte Application of      Case No.    CV 18 80 024 MISC

16  SAM RAINSY, an individual residing in France,

17       Applicant,       ***EX PARTE* APPLICATION FOR
ORDER PURSUANT TO 28 U.S.C. § 1782
GRANTING LEAVE TO OBTAIN**

18  For an Order Pursuant to 28 U.S.C. § 1782
    Granting Leave to Obtain Discovery from   **DISCOVERY FOR USE IN FOREIGN
PROCEEDINGS; SUPPORTING**

19  FACEBOOK, INC.,        **MEMORANDUM OF POINTS AND
AUTHORITIES**

20       Respondent,

21  For use in connection with Foreign Proceedings.

22

23

24

25

26

27

28

1       Applicant Sam Rainsy files this Application pursuant to 28 U.S.C. § 1782 seeking leave to

2   serve Facebook, Inc., a corporation located in the Northern District of California, with a subpoena

3   seeking discovery, or, in the alternative, for an Order to Show Cause as to why such discovery

4   should not be granted.  This Application is supported by the accompanying Memorandum of Points

5   and Authorities, the Declaration of Applicant Sam Rainsy (the "Sam Decl."), the Declaration of

6   counsel J. Noah Hagey (the "Hagey Decl."), and all other papers and things in support thereof

7   and/or of which the Court might properly take judicial notice.

8                          **SUMMARY OF REQUESTED RELIEF**

9       Applicant is a founder of the Cambodian National Rescue Party ("CNRP"), the leading

10  United Nations-recognized opposition party in Cambodia.  For decades, Applicant has been

11  Cambodia's most vocal political opposition figure and been subject to assassination attempts and

12  threats from Cambodia's ruling authoritarian ruler and ex-Khmer Rouge commander, Hun Sen.

13      Applicant brings this Petition to obtain targeted discovery in Facebook's possession

14  pursuant to Section 1782.  The material is for use in connection with responding to criminal and

15  civil proceedings initiated against Applicant by Hun Sen and his regime.  Hun and his agents have

16  misused Facebook to publish death threats against Applicant, spread false propaganda, and mislead

17  ordinary Cambodians about Hun's alleged popularity.

18      The information in Facebook's possession will help Applicant respond to Hun's and his

19  regime's charges and to establish their rampant funding and misuse of Facebook's platform.  In

20  Cambodia, like many countries, and especially repressive ones where traditional media is restrained

21  by the government and where mobile phones are ubiquitous, Facebook has become the main

22  platform for news and discourse.  The site's ability to broadly distribute information also has been

23  a source of well-publicized concern about its abuse by corrupt interests to instantaneously

24  manipulate the opinions of vast numbers of people.  Facebook increasingly has embraced this

25  challenge, recognizing that it "ha[s] a moral duty to understand how these technologies are being

26  used and what can be done to make communities like Facebook as representative, civil and

27  trustworthy as possible."  (Hagey Decl., **Ex. 3** (Samidh Chakrabarti, *Hard Questions: What Effect*

28  *Does Social Media Have on Democracy?* FACEBOOK NEWSROOM (Jan. 22, 2018) *available at*

1  https://newsroom.fb.com/news/2018/01/effect-social-media-democracy/).)

2  As detailed in the Application, there is significant evidence that Hun and his agents have

3  systematically misused Facebook's platform in violation of its policies, principles and community

4  standards.  Hun's government has used the network to threaten violence against political opponents

5  and dissidents, disseminate false information, and manipulate his (and the regime's) supposed

6  popularity, thus seeking to foster an illusion of popular legitimacy.

7  As part of their effort to quell dissent and to mislead the public, Hun and his cohorts have

8  brought at least four pending legal proceedings against Applicant based on content he posted on

9  Facebook.  *First*, on or about March 10, 2016, the government official in charge of Hun's

10  Facebook page filed civil defamation charges against Applicant for posting that millions of Hun's

11  Facebook "likes" were deceptively generated by "click farms."  *Second*, on or about August 1,

12  2016, Hun commenced criminal defamation and "incitement" charges against Applicant for posting

13  on his Facebook page that the murder of respected human rights activist and journalist Dr. Kem

14  Ley was a government-ordered assassination.  *Third*, on or about January 17, 2017, the government

15  initiated criminal defamation charges at the behest of a Cambodian celebrity with ties to the Hun

16  regime after Applicant posted information showing that the celebrity had been bribed by Hun's

17  associates (including members of Hun's family) to voice support for the government. *Fourth*, on or

18  about December 7, 2017, the Hun regime charged Applicant with criminal "incitement" based on

19  statements Applicant posted to his Facebook page urging Cambodia's military to cease use of

20  deadly force against peaceful protestors.

21  The requested discovery seeks documents and information that will allow Applicant to

22  defend against the foregoing proceedings, to reopen or seek appeal of those cases, as well as to file

23  related cases challenging Hun's abuses of power.  Applicant's Subpoena and related document

24  requests and deposition categories are set forth as **Exhibit 1** to the Declaration of J. Noah Hagey

25  and are incorporated by reference herein as if set forth in their entirety.

26  This Application is based on the attached Memorandum of Point and Authorities, the

27  Declaration of Sam Rainsy and documents appended thereto, and the Declaration of J. Noah

28  Hagey, including the Subpoena appended as **Exhibit 1** thereto.

Dated:  February 8, 2018

BRAUNHAGEY & BORDEN LLP

_____
J. Noah Hagey, Esq.

Attorneys for Applicant Sam Rainsy

3

1  J. Noah Hagey, Esq. (SBN: 262331)
     hagey@braunhagey.com
2  Matthew Borden, Esq. (SBN: 214323)
     borden@braunhagey.com
3  BRAUNHAGEY & BORDEN LLP
    220 Sansome Street, Second Floor
4  San Francisco, CA 94104
    Telephone: (415) 599-0210
5  Facsimile: (415) 276-1808

6  Richard J. Rogers, Esq. (SBN: 189978)
     richardrogers@globaldiligence.com
7  GLOBAL DILIGENCE LLP
    Kemp House
8  152 City Rd
    London EC1V 2NX
9  UNITED KINGDOM
    Telephone: +44 (0)74 84822740
10

11  COUNSEL FOR APPLICANT SAM RAINSY

12              **UNITED STATES DISTRICT COURT**

13           **NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| *In re* Ex Parte Application of | Case No. |
| SAM RAINSY, an individual residing in France, | |
|     Applicant, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF 28 U.S.C. § 1782 APPLICATION FOR DISCOVERY FROM FACEBOOK, INC.** |
| For an Order Pursuant to 28 U.S.C. § 1782 Granting Leave to Obtain Discovery from | |
| FACEBOOK, INC., | |
|     Respondent, | |
| For use in connection with Foreign Proceedings. | |

**TABLE OF CONTENTS**

SUMMARY OF REQUESTED RELIEF ........................................................................................ 1

TABLE OF CONTENTS ................................................................................................................ i

TABLE OF AUTHORITIES ......................................................................................................... iii

INTRODUCTION .......................................................................................................................... 1

FACTUAL BACKGROUND ......................................................................................................... 3

    A.    Hun's Violent Rise to Power and Brutal Dictatorship in Cambodia ..................... 3

    B.    Hun's Misuse of Facebook ................................................................................... 5

        1.    Hun's Use of Click Farms to Generate Fake "Likes" ................................ 5

        2.    Hun's Use of Facebook to Spread Fake News .......................................... 6

        3.    Hun's Misuse of Facebook to Make Violent Threats ................................ 8

        4.    Hun's Funding of Massive Facebook Advertising to Help Dissiminate Government Propaganda ......................................................... 8

    C.    The Foreign Legal Proceedings against Applicant ............................................... 9

    D.    Hun Seeks to Manipulate Facebook to Mislead and Coerce Cambodians and Undermine Legitimate Elections .............................................. 10

    E.    Hun's Misuse of Facebook Violates Facebook's Terms of Use and Community Standards ......................................................................................... 12

        1.    Facebook's Policies ................................................................................. 12

        2.    Hun's Misconduct Is Ongoing and – As of Yet – Unchecked by Facebook ............................................................................................ 14

ARGUMENT ................................................................................................................................ 15

I.    THE APPLICATION SATISFIES THE STATUTORY REQUIREMENTS OF SECTION 1782 ........................................................................................................ 15

    A.    Facebook Resides in the Northern District of California ..................................... 16

    B.    Applicant is an "Interested Person" under § 1782 ............................................. 16

    C.    Materials Are Sought for Use in Connection with Foreign Proceedings ......................................................................................................... 17

II.    THE SUPREME COURT'S INTEL FACTORS STRONGLY FAVOR GRANTING THIS APPLICATION .............................................................................. 17

    A.    Facebook Is Not a Party to the Foreign Proceedings ......................................... 18

| | B. | The Applicant Seeks Highly Relevant Information That Will Assist the Foreign Courts | 18 |
|---|---|---|---|
| | C. | No Foreign Discovery Restrictions Bar Applicant's Requested Discovery | 20 |
| | D. | The Requested Discovery Is Targeted to Avoid Undue Burden | 21 |
| | E. | Granting Applicant's § 1782 Request Would Promote Efficient Discovery | 21 |

CONCLUSION ............................................................................................................................. 21

## TABLE OF AUTHORITIES

**CASES**

*Application of Malev Hungarian Airlines,*
 964 F.2d 97 (2d. Cir. 1992) .......................................................................................... 21

*Citizens United v. Fed. Election Comm'n,*
 558 U.S. 310 (2010)..................................................................................................... 16

*In re Ex Parte Application of Qualcomm Inc.,*
 162 F. Supp. 3d 1029 (N.D. Cal. 2016) ...................................................................... 16

*In re Management Servs., Ltd.,*
 2005 WL 1959702 (E.D.N.Y. Aug. 16, 2005) ............................................................ 21

*In re Republic of Ecuador,*
 No. 1:10-MC-00040 GSA, 2010 WL 4027740 (E.D. Cal. Oct. 14, 2010)................... 17

*In re Veiga,*
 746 F. Supp. 2d 8 (D.D.C. 2010).................................................................................. 17

*Intel Corp. v. Advanced Micro Devices, Inc.,*
 542 U.S. 241 (2004)............................................................................... 15, 16, 17, 20

**STATUTES**

28 U.S.C. § 1782................................................................................................... passim

28 U.S.C. § 1782(a) ............................................................................................ 3, 15, 16

1    Applicant Sam Rainsy respectfully submits this Memorandum in support of his Application,

2  pursuant to 28 U.S.C. § 1782, for leave to serve discovery in aid of foreign proceedings.

3                                    **INTRODUCTION**

4    1.    Applicant respectfully requests leave to serve Facebook, Inc., a local corporation,

5  with a Subpoena seeking targeted discovery in aid of foreign proceedings, or in the alternative, an

6  Order to Show Cause as to why such a Subpoena should not be issued.  The Subpoena and

7  [Proposed Order] granting the requested relief are attached to this Application as **Exhibits 1** and **2**

8  to the Declaration of J. Noah Hagey ("Hagey Decl.").

9    2.    Applicant is a founder and leader of the Cambodian National Rescue Party

10  ("CNRP"), the only significant opposition party in Cambodia.  For over 30 years, Cambodia has

11  been ruled by Hun Sen, a former Khmer Rouge commander, who has remained in power by

12  manipulating elections, censorship, extrajudicial killings, arbitrary arrests, and summary trials.

13  (Hagey Decl., **Ex. 6** (*30 Years of Hun Sen: Violence, Repression, and Corruption in Cambodia*,

14  HUMAN RIGHTS WATCH (Jan. 12, 2015), https://www.hrw.org/report/2015/01/12/30-years-hun-

15  sen/violence-repression-and-corruption-cambodia ("Human Rights Watch Report")).)

16    3.    Hun has explained his political philosophy as follows: "I not only weaken the

17  opposition, I'm going to make them dead . . . and if anyone is strong enough to try to hold a

18  demonstration, I will beat all those dogs and put them in a cage." (*Id.* at 1 (ellipses in original).)  In

19  his longstanding rein, international organizations have documented the regime's systematic

20  intimidation and murder of "hundreds of opposition figures, journalists, trade union leaders, and

21  others … in politically motivated attacks." (*Id*. at 2.)

22    4.    Hun has also maintained his power by initiating "legal proceedings" against his

23  opponents.  (Declaration of Sam Rainsy ("Sam Decl.") ¶¶ 3, 5-7, 11-12.)  In 2016, at least 20

24  individuals aligned with the CNRP, including members of Cambodia's Parliament and their

25  supporters, were arrested.  (*Id.* ¶ 9.)  Three are serving 20-year sentences.  (*Id.*)  In September

26  2017, the acting President of the CNRP was arrested.  (*Id.* ¶ 10.)  In November 2017, the

27  Cambodian Supreme Court held a summary trial that disbanded CNRP and banned 118 of its senior

28  officials from any political activity in Cambodia for five years.  (Hagey Decl., **Ex. 7** (Ben Sokhean,

1  Mech Dara, & Ananth Baliga, *'Death of Democracy': CNRP Dissolved by Supreme Court Ruling*,

2  THE PHNOM PENH POST, Nov. 17, 2017, *available at* http://www.phnompenhpost.com/national-

3  post-depth-politics/death-democracy-cnrp-dissolved-supreme-court-ruling).)  The decision has

4  been widely condemned by prominent international human rights groups as well as the U.S.

5  Congress and the White House.  (Hagey Decl., **Ex. 8** (Press Release, White House Press Secretary,

6  Setbacks to Democracy in Cambodia, *available at* https://www.whitehouse.gov/briefings-

7  statements/statement-press-secretary-setbacks-democracy-cambodia/ ("White House Press

8  Release")); *Id.,* **Ex. 9** (S. Res. 279, 115th Cong. (2017), *available at*

9  https://www.congress.gov/bill/115th-congress/senate-resolution/279/text ("U.S. Senate Resolution

10  279") (quoting Human Rights Watch Report)).)

11       5.    Because he has not been able to capture or kill Applicant, Hun and his cronies have

12  initiated four legal actions against Applicant in Cambodia, even though he is currently living in

13  exile in France.  (Sam Decl. ¶¶ 3, 5-7, 11-12.)  In one proceeding, Applicant has been sued for

14  defamation for posting on his Facebook page that the "likes" on Hun's Facebook page were

15  purchased from click farms.  In another defamation case, Applicant was sued for posting on

16  Facebook that Hun bribed a social media star to support him.  In a third defamation case, Applicant

17  has been sued for posting on his Facebook page that the assassination of political activist, Dr. Kem

18  Ley, was a government hit.[1]  In a fourth proceeding, Applicant is being criminally prosecuted for

19  "incitement" based on statements he posted to Facebook urging Cambodia's military not to use

20  deadly force against peaceful protestors.  Applicant seeks the requested discovery to defend himself

21  in these proceedings, all of which are presently pending.

22       6.    The Application satisfies § 1782's three statutory requirements.  First, it has been

23  filed in "the district in which [the] person resides" because Facebook is based in Menlo Park,

24

---

25  [1] On January 11, 2018, Hin Vansreypov was sentenced to prison for "incitement to commit a felony" for posting on Facebook that Hun's regime was responsible for assassinating Dr. Ley, and

26  political analyst Kim Sok is also serving time over similar comments. (Hagey Decl., **Ex. 10** (Niem Chheng, *Woman Who Accused Hun Sen of Kem Ley Assassination on Facebook Sentenced*, THE

27  PHNOM PENH POST, Jan. 11, 2018, *available at* http://www.phnompenhpost.com/national/woman-who-accused-hun-sen-kem-ley-assassination-facebook-sentenced

28  ("Assassination Article")).)

1    California.  28 U.S.C. § 1782(a).  Second, Applicant seeks the requested discovery "for use in a

2    proceeding in a foreign ... tribunal" – in Cambodia's domestic courts. (Sam Decl. ¶¶ 6-7, 11-12.)

3    Third, Applicant qualifies as an "interested person" in those foreign proceedings because he is a

4    defendant. (*Id.*)  The Application also satisfies the four prudential *Intel* factors set forth by the

5    Supreme Court because (1) Facebook is not a party to any of the foreign proceedings, (2) the

6    information sought is highly relevant, (3) there are no applicable foreign discovery restrictions, (4)

7    Applicant's requests are not unduly burdensome, and 5) granting the Application will promote

8    efficient discovery.

9        7.      Facebook has stated its commitment to preventing political misuse of its valuable

10    platform.  Prompt release of the targeted discovery requested in this Application would further that

11    goal.  For these and other reasons, Applicant respectfully seeks prompt production of the requested

12    discovery.

13                              **FACTUAL BACKGROUND**

14        **A.**      **Hun's Violent Rise to Power and Brutal Dictatorship in Cambodia**

15        8.      Starting as a platoon-leader, Hun climbed through the ranks of the Khmer Rouge,

16    where units under his control committed crimes against humanity, including mass executions and

17    attacks on civilians. (Hagey Decl., **Ex. 6** at 13-15, 18-20 (Human Rights Watch Report).)  After

18    Vietnam invaded Cambodia in 1979, Hun was appointed foreign minister of the Vietnamese-

19    backed People's Republic of Kampuchea ("PRK"), which ran the country as a police state. (*Id.*)[2]

20    He became prime minister in 1985, where he sought to eliminate political opposition and dissent

21    through "widespread and systematic violations of human rights in both conflict and non-conflict

22    settings, including large-scale prolonged arbitrary detention without charge or trial; unfair trials;

23    routine torture and other cruel, inhuman or degrading treatment of detainees; and extra-judicial

24    killings." (*Id.* at 27.)  Since 1985, Hun has ruled Cambodia with an iron fist.

25

26    [2] Before becoming prime minister, Hun was instrumental in running the notorious K5 program,

27    which was a forced-labor project to build a wall between Cambodia and Thailand.  As many as a million citizens were forced to work without pay, with little food, without medical care, and often

28    without mosquito netting, resulting in numerous deaths from malaria. (*Id.* at 22-26.)  Many others were killed and disfigured by landmines. (*Id.*)

9.      Applicant is the longstanding leader of Cambodia's movement for reform and democracy. After the killing of a journalist in 1996, Applicant began "staging regular protests over labor rights, corruption, illegal logging, the environment, and the lack of political pluralism." (*Id.* at 37.) After the formation of Cambodia's first labor unions in 1997, more protests ensued. Applicant attended many of them. (*Id.*)

10.      In 1997, a peaceful demonstration attended by Applicant was broken up by a grenade attack. (*Id.*) "When the grenade-throwing was over, at least 16 people lay dead and dying. More than 150 were injured." (*Id.*) Human Rights Watch described the attack as follows:

> The main target, Sam Rainsy, survived the attack. After the first grenade exploded, Rainsy's bodyguard, Han Muny, threw himself on top of his leader. He took the full force of a subsequent grenade and died at the scene. … Body parts of other victims littered the area…. One photo shows a teenage girl with her legs blown off trying to stand up. Cambodian police present not only did not help the injured, but some tried to block bystanders from assisting victims.

(*Id.* at 37-38.) It further explained:

> The attack was well-planned. Members of the personal bodyguard unit of Hun Sen, Brigade 70, were deployed in full riot gear at the rally. … The elite military unit not only failed to prevent the attack, but was seen by numerous witnesses opening up its lines to allow the grenade-throwers to escape through a CPP-controlled [Cambodian People's Party] area of Phnom Penh, and then threatened to shoot people trying to pursue the attackers.

(*Id.* at 38.)

11.      "The March 30 grenade attack has cast a long shadow over Cambodian politics that remains today." (*Id.* at 39.) Since the time of the attack, Hun has maintained control of Cambodia through violence and fear and has continued with his practice of extrajudicial killings, including the assassination of Dr. Kem Ley one year ago. (*Id.* at 58.)

12.      Both the United States Congress and the White House have condemned Hun for "dissolution" of the political party opposing him – Applicant's CNRP – as well as suppressing the independent media and manipulating elections. (Hagey Decl., **Ex. 8** (White House Press Release); *Id.*, **Ex. 9** (U.S. Senate Resolution 279).) Bringing legal proceedings against his enemies is also an important way Hun has maintained his dictatorship. (*Id.*, **Ex. 9** (U.S. Senate Resolution 279

1  ("during the first 10 months of 2014, the Phnom Penh Municipal Court sentenced 55 people to

2  prison terms after unfair trials on charges such as 'treacherously plotting' to stage an armed

3  insurrection; instigating, inciting, or perpetrating violence; obstructing traffic; or engaging in

4  'violent resistance against a public official.' In these proceedings, no credible evidence was

5  presented to support a guilty verdict") (documenting imprisonment of "peaceful protesters" on

6  "charges of obstructing traffic and obstructing government authorities' performance of their official

7  duties")).)

8  **B. Hun's Misuse of Facebook**

9      13.    In 2016, Facebook became Cambodia's most popular news source. (Hagey Decl.,

10  **Ex. 11** (Ben Paviour, *What a Facebook Experiment Did to News in Cambodia*, BBC NEWS (Oct.

11  31, 2017), *available at* http://www.bbc.com/news/world-asia-41801071 ("Facebook Experiment

12  Article")).) Facebook played a critical role in helping Applicant's CNRP gain seats over Hun's

13  Cambodian People's Party ("CPP") in the 2013 parliamentary election. (*Id.*) After his party lost

14  seats in the 2013 election to the opposition, Hun ramped up his presence on Facebook. (*Id.*) He

15  then began misusing the platform by artificially inflating the number of "likes" on his page to

16  create the appearance of popular support and spreading fake news.

17      **1. Hun's Use of Click Farms to Generate Fake "Likes"**

18      14.    Hun's Facebook page was set up after his party, the Cambodian People's Party

19  ("CPP") lost more than 20 parliamentary seats to Applicant's CNRP in the 2013 election. (Hagey

20  Decl., **Ex. 12** (Elaine Kurtenbach and Sopheng Cheang, *Cambodia Leaders Rev Up Facebook*

21  *Rivalry As Popularity Soars*, JAKARTA POST, Mar. 3, 2016, *available at*

22  http://www.thejakartapost.com/news/2016/03/03/cambodia-leaders-rev-facebook-rivalry-

23  popularity-soars.html).) Since then, Hun has misused the platform to manipulate the Cambodian

24  public into thinking he enjoys widespread popular support. For example, even though Hun is

25  relatively new to Facebook, a study by public relations firm Burson-Marsteller ranked his page as

26  the eighth most popular in the world. (Hagey Decl., **Ex. 11** (Facebook Experiment Article).) This

27  is especially remarkable because Cambodia is the 71st most populous country in the world. (Hagey

28  Decl., **Ex. 13** (ranking countries by population size).)

15.     Hun has achieved this level of "popularity" by utilizing "click farms"[3] to artificially bolster the number of "likes" on his page and posts, which explains why Hun's Facebook page is "liked" by nearly 9.4 million people even though only 4.8 million Cambodians use Facebook. *Compare* Hagey Decl., **Ex. 14** (showing over 9 million "likes" on Hun Sen's page) *with* Hagey Decl., **Ex. 15** (Megha Rajagopalan, *This Country's Democracy Has Fallen Apart – And it Played Out to Millions on Facebook*, BUZZFEED NEWS (Jan. 21, 2018), *available at* https://www.buzzfeed.com/meghara/ facebook-cambodia democracy?utm_term=.uiKoXo3rBk#.btYv0v5m1b ("Democracy Has Fallen Apart Article") ("Cambodia has about 4.8 million Facebook users, according to a 2017 assessment.")).

16.     Millions of "likes" on Hun's page, which is only available in Khmer, come from India, the Philippines, Brazil, and Myanmar – countries where Khmer is not widely spoken and that are well-known for operating click farms.  (Sam Decl., **Ex. 1** (Daniel Nass & Shaun Turton, *Only 20 per cent of PM's recent Facebook 'likes' from Cambodia*, THE PHNOM PENH POST, March 9, 2016, *available at* http://www.phnompenhpost.com/national/only-20-cent-pms-recent-facebook-likes-cambodia).)

17.     Utilizing click farms to generate fake "likes" on Facebook pages and posts is a direct violation of Facebook's policies.  (Hagey Decl., **Ex. 16** (*Facebook Pages: Keeping Activity Authentic*, FACEBOOK, https://www.facebook.com/business/a/page/fake-likes ("Keeping Activity Authentic Article") ("We have a strong incentive to aggressively go after the bad actors behind fake likes")).)

### 2.     Hun's Use of Facebook to Spread Fake News

18.     Hun also uses the Facebook platform to propagate fake news.  "When Facebook first came to Cambodia, many hoped it would help to usher in a new period of free speech, amplifying voices that countered the narrative of the government-friendly traditional press. Instead, the

---

[3] Click farms employ "low paid workers" in developing countries like India and the Philippines to create fake Facebook accounts and then artificially "bolster likes, followers, and views" on profiles and posts to make them appear more popular than they really are. *See* Sam Decl., **Ex. 1**.

opposite has happened. Prime Minister Hun Sen is now using the platform to promote his message while jailing his critics." (Hagey Decl., **Ex. 15** (Democracy Has Fallen Apart Article).)

In November 2017, *The Nation* reported:

> In [the] past, Hun Sen has relied on more traditional strongman tactics to maintain power.  In 1997, Hun Sen removed his rivals in a *coup d'état*, sending tanks and soldiers into the streets.  But with fake news, autocrats no longer need to resort to open violence or to dispatch their special forces to capture radio and TV stations to broadcast their messages.  From Facebook, leaders can dream up conspiracies, publish them on their own fake-news pages, use targeted advertising to reach susceptible audiences, and *voilá* - they have manufactured a new ruling mandate . . . . With declining access to independent newspapers and radio broadcasts, *Facebook seemed [Cambodians'] most trusted source of information . . . . [Hun Sen's spreading of fake news on Facebook is] in many ways . . . indicative of how despots seize power in the age of Facebook.*

(Hagey Decl., **Ex. 17** (Geoffrey Cain, *Fake News and the Death of Democracy in Cambodia*, THE NATION (Nov. 21, 2017), *available at* https://www.thenation.com/article/fake-news-and-the-death-of-democracy-in-cambodia/ (emphasis added)).)

19.    In addition to his own Facebook page and the government's Facebook page, Hun promotes fake news through "independent" Facebook posts.  For example, Lim Cheavutha, the founder of Fresh News, Cambodia's equivalent of Breitbart, "says he's so close to Hun Sen that they sometimes message about stories well past midnight." (Hagey Decl., **Ex. 15** (Democracy Has Fallen Apart Article).)

20.    One of the most egregious examples of Hun posting intentionally fabricated misinformation on Facebook involves his treatment of former members of Applicant's opposition party.  Many CNRP members have fled to other countries in the wake of the regime's crack down on dissidents and human rights activists.

21.    On November 26, 2017, Hun used Facebook to lure those expatriates back to Cambodia.  During a live Facebook broadcast, he told dissidents that "no harm would come" to those that returned to Cambodia. *See* https://youtu.be/GLJ9pb6IWVA (last visited 2-8-2018). *See also* Yon Sineat, *PM warns former CNRP members in Thailand of deporation*, THE PHNOM PENH

1  Post, Nov. 28, 2017, *available at* http://www.phnompenhpost.com/national-politics/pm-warns-
2  former-cnrp-members-thailand-deportation (last visited 2-8-2018).  Hun expressly stated that he
3  would "not do anything" to them.  *Id.*

4       22.  Hun's "news" and propaganda presented in the video – which was seen by hundreds
5  of thousands of viewers, was intentionally false.  As dissidents returned to the country in reliance
6  on Hun's messages, they were arrested.  For example, former CNRP member Ysa Osman returned
7  to Cambodia from Thailand and was arrested by the government.  *See* Tina Zarya, *Another*
8  *opposition candidate was arrested for sending workers overseas*, Radio Free Asia (Feb. 7, 2018),
9  *available at* https://www.rfa.org/khmer/news/politics/CNRP-mp-candidate-arrested-
10  02072018090259.html (last visited 2-8-2018).

11                **3.**  **Hun's Misuse of Facebook to Make Violent Threats**

12       23.  To maintain public fear and intimidate his enemies, Hun uses Facebook to make
13  threats against dissidents and against Applicant in particular.  For example, most recently on
14  February 1, 2018, Hun posted a video of a recent speech in which he threatened to kill Applicant.
15  (Hagey Decl., **Ex. 17A**, available at https://www.facebook.com/hunsencambodia/
16  videos/1594981950550296/.)  From -41:50 to -38:00, Hun threatens to use Soviet-made multiple
17  rocket launchers BM-21 against Applicant and his supporters.  (Hagey Decl. ¶ 19.)  From -9:50 to -
18  8:10, Hun threatens to have Applicant illegally arrested (or abducted) if Applicant dares to come to
19  *any part of Asia*, i.e., including territories outside of Cambodia.  (*Id.*)

20                **4.**  **Hun's Funding of Massive Facebook Advertising to Help Dissiminate Government Propaganda**

21       24.  In order to help dominate Facebook's newsfeed in Cambodia, Hun and his agents
22  have purchased substantial advertising on the platform.

23       25.  According to Hun's own communications, Hun and/or his representatives have paid
24  Facebook up to $15,000 *per day,* and over $5,000,000 *per year,* in generating fake "likes" and
25  advertising on the network to help dissiminate the regime's propaganda and drown-out any
26  competing voices.
27
28

26.     To put such figures in perspective, the average Cambodian makes less than $153 USD *per month*, and less than $2,000 USD *per year*.  Hun's annual Facebook advertising expenditures thus represent the total annual income of over 2,500 Cambodian citizens.

### C.     The Foreign Legal Proceedings against Applicant

27.     There are currently four proceedings that Hun and his agents have filed against Applicant. (Sam Decl. ¶¶ 3, 5-7, 11-12.)  In one proceeding, Applicant was sued for defamation by Som Soeun, the government official in charge of Hun's Khmer language Facebook page, for posting that the majority of the "likes" on Hun's page were purchased from "click farms." (Sam Decl. ¶ 6.)  On November 8, 2016, Applicant was found guilty of defamation for his statements regarding the legitimacy of the "likes" on Hun's Facebook page. (Sam. Decl. ¶ 6.)  The judgment was summarily upheld in January 2017, and Applicant is appealing in Cambodia's Supreme Court. (*Id.*)  Under Cambodian law, Applicant may submit evidence as part of his appeal. (Cambodian Criminal Proceedings Code, Arts. 444-46; Sam Decl. ¶ 16; **Ex. 6**.)

28.     Hun and his agents have also initiated a criminal defamation prosecution against Applicant for stating on his Facebook page that the assassination of the political activist, Dr. Kem Ley, was ordered by the Cambodian government. (Sam Decl. ¶ 7.)  Applicant was convicted of those charges on March 30, 2017, and is appealing that conviction. (*Id.*)  At least two other people have been sentenced to prison for similar speech. (Hagey Decl., **Ex. 10** (Assassination Article).)

29.     In January 2017, Hun filed a defamation suit against Applicant based on a Facebook post in which Applicant claimed that Cambodian social media celebrity (and former CNRP supporter) Thy Sovantha accepted a $1 million bribe from Hun to switch parties and speak out against the CNRP. (Sam Decl. ¶ 12.)  On December 28, 2017, Applicant was found guilty of defamation, and ordered to pay a fine approximately equivalent to $1 million USD.  Applicant is appealing this judgment as well. (*Id.*).

30.     Most recently, on December 7, 2017, just weeks after the Cambodia Supreme Court issued an internationally condemned decision disbanding the Applicant's CNRP party and banning 118 of its members from participating in politics for five years, the Cambodian government commenced a criminal prosecution against Applicant for criminal "incitement" based on statements

1  Applicant posted to Facebook urging Cambodia's military not to use deadly force against peaceful

2  protestors.  (*Id.* ¶ 11.)

3    **D.**    **Hun Seeks to Manipulate Facebook to Mislead and Coerce Cambodians and**
         **Undermine Legitimate Elections**
4

5    31.    Hun's misuse of Facebook is widespread and well known – and emulates some of

6  the issues encountered in other countries, including during the 2016 U.S. presidential election.  In

7  the wake of these events, Facebook has become "embroiled in a larger debate over its role in

   spreading fake news and misinformation aimed at influencing elections in the United States and
8
   other nations." (Hagey Decl., **Ex. 18** (Sheera Frenkel, Nicholas Casey, and Paul Mozur, *In Some*
9
   *Countries, Facebook's Fiddling Has Magnified Fake News*, N.Y. TIMES, Jan. 14, 2018, *available at*
10
   https://www.nytimes.com/2018/01/14/technology/facebook-news-feed-changes.html ("Facebook
11
   and Fake News Article")).)  Others have commented that the platform is now reckoning "with its
12
   role in passively enabling human rights abuses."  (Hagey Decl., **Ex. 19** (Ingrid Burrington, *Could*
13
   *Facebook Be Tried for Human-Rights Abuses?*, THE ATLANTIC (DEC. 20, 2017), *available at*
14
   https://www.theatlantic.com/technology/archive/2017/
15
   12/could-facebook-be-tried-for-war-crimes/548639/ (Facebook "was accused of censoring activists
16
   and journalists documenting incidents and posting about what the State Department has called
17
   ethnic cleansing of the country's Rohingya minority")).)
18
     32.    In October 2017, Facebook began testing changes to its popular "News Feed" in six
19
   post-conflict countries, including Cambodia (the "test countries").  (Hagey Decl., **Ex. 18** (Facebook
20
   and Fake News Article).)  In the test countries, Facebook moved news posts off its general News
21
   Feed and onto a new section of the platform called "Explore Feed."  (*Id.*)
22
     33.    The Explore Feed has hampered ordinary citizens' ability to spread independent
23
   news in two ways.  First, it moved news onto a page few Cambodians use, or even know about.
24
   (Hagey Decl., **Ex. 11** (Facebook Experiment Article).)  Second, it requires news sources to pay to
25
   sponsor posts, something many of the NGOs and independent news sources reporting on Hun's
26
   dictatorial tactics are unable to do.  (*E.g.*, Hagey Decl., **Ex. 20** (Thomas Beller, *The Devastating*
27
   *Shutdown of the Cambodia Daily*, THE NEW YORKER (Sept. 12, 2017), *available at*
28

1  https://www.newyorker.com/news/news-desk/the-devastating-shutdown-of-the-cambodia-daily

2  (Cambodia's premier independent newspaper *The Cambodian Daily* was forced to shut down after

3  the Cambodian government "presented the publishers with a spurious tax bill of over six million

4  dollars.")).)

5       34.     The change to Facebook's News Feed in Cambodia was made at a particularly

6  inopportune time as "Cambodia is in the throes of its most severe government crackdown in years

7  ahead of a national election next July [2018] that could test the durability of Prime Minister Hun

8  Sen, one of the longest-serving heads of government in the world." (Hagey Decl., **Ex. 11**

9  (Facebook Experiment Article).) In fact, Facebook became critically important as a source of

10  independent news in Cambodia after Hun and his corrupt regime shut down "more than a dozen

11  radio stations and the local offices of two independent media outlets, Radio Free Asia and The

12  Cambodia Daily." (*Id.*) In October 2017, The *BBC* reported that Facebook has become "one of the

13  only places for dissent in a country ranked 132nd out of 180 countries in Reporters without Borders'

14  2017 World Press Freedom Index." (*Id.*)

15       35.     Though likely unintentional, Facebook's recent initiative has given an even stronger

16  "competitive edge" to Hun's "authoritarian and corrupt" regime – a regime that has been

17  condemned by prominent international human rights groups such as the United Nations as well as

18  the United States White House and Senate. (*See* Hagey Decl., **Ex. 21** (*UN rights chief voices*

19  *concern about Cambodia election after opposition ban,* UN NEWS CENTRE (Nov. 17, 2017),

20  *available* at http://www.un.org/apps/news/story.asp?NewsID=58111#.WmJYh6inE2w); *Id.,* **Ex. 6**

21  (Human Rights Watch Report); *Id.,* **Exs. 8-9** (White House Press Release; U.S. Senate Resolution

22  279).)

23       36.     Additionally, on information and belief, Hun and/or the Cambodian government

24  have expended substantial sums, up to $15,000 per day, on Facebook advertising to help drive

25  regime-positive content, including false news stories, to Cambodia's citizens.

26

27

28

1

**E.      Hun's Misuse of Facebook Violates Facebook's Terms of Use and Community Standards**

2

**1.      Facebook's Policies**

3      37.      Facebook has sought to prevent misuse of its platform, including through

4   prohibiting the very types of abuse engaged in by Hun.  When a user signs up for Facebook, the

5   user must adhere to Facebook's Terms and Policies, which are reflected in various terms and

6   statements on the company's website, https://www.facebook.com/policies (the "Facebook

7   Policies"). The Facebook Policies incorporate its Data Policy and Principles and Community

8   Standards.  (*Id.*, **Exs. 21A-21C**.)

9      The Statement of Rights and Responsibilities provides:

10           6. You will not bully, intimidate, or harass any user.

11           7. You will not post content that: is hate speech, threatening, or
             pornographic; incites violence; or contains nudity or graphic or
12           gratuitous violence. …

13           9. You will not use Facebook to do anything unlawful, misleading,
             malicious, or discriminatory.…

14   (Hagey Decl., **Ex. 26**.)

15      38.      These rules are also discussed in Facebook's Community Standards, which were

16   developed with the goal of helping "people … feel safe when using Facebook."  (Hagey Decl., **Ex.**

17   **21B**.)  The Community Standards explain that Facebook will "remove credible threats to public

18   figures" and prohibit the use of "misleading or inaccurate information to artificially collect likes,

19   followers, or shares."  (*Id.*)

20      39.      The Facebook policies are based on the site's foundational and guiding principle of

21   "mak[ing] the world more open and transparent" so as to "create greater understanding and

22   connection."  (Hagey Decl., **Ex. 21C** (Facebook, *Facebook Principles*,

23   https://www.facebook.com/principles.php (last visited Feb. 7, 2018)).)

24      40.      Facebook also has come under public scrutiny and criticism around alleged abuses

25   committed through its site by malignant interests, which rose to a fever pitch following the 2016

26   U.S. election.  In response, Facebook has repeatedly emphasized its commitment to shutting down

27   misuse of its platform.

28      41.      For example, on October 31, 2017, Facebook's General Counsel, Colin Stretch,

1  testified before Congress that more than 126 million users potentially saw inflammatory political

2  ads bought by a Kremlin-linked company leading up to the 2016 U.S. presidential elections.

3  (Hagey Decl., **Ex. 22** (Cecilia Kang, Nicholas Fandos, & Mike Isaac, *Tech Executives Are Contrite*

4  *About Election Meddling, but Make Few Promises on Capitol Hill*, N.Y. TIMES, Oct. 31, 2017,

5  *available at* https://www.nytimes.com/2017/10/31/us/politics/facebook-twitter-google-hearings-

6  congress.html?mtrref=undefined).)

7      42.    Mr. Stretch's opening remarks as General Counsel explained that misuse of the

8  platform to rig elections and mislead the public would no longer be tolerated:

9           The foreign interference we saw is reprehensible. **That foreign**
           **actors, hiding behind safe accounts, abused our platform and**
10          **other Internet services to try to sow division and discord -- and**
           **to try to undermine the election -- is an assault on democracy**
11          **that is directly contrary to our values and violates everything**
           **Facebook stands for.**
12

13  *Id.* (emphasis added). Likewise, after rolling out modifications to Facebook's News Feed in the

14  test countries, Mr. Mosseri, head of Facebook's News Feed, issued a statement that the company

15  takes its role as a "global platform for information" seriously. (Hagey Decl., **Ex. 18** (Facebook and

16  Fake News Article).) "We have a responsibility to the people who read, watch, and share news on

17  Facebook, and every test is done with that responsibility in mind." *Id.*

18      43.    Messrs. Stretch and Mosseri's statements are aligned with Mark Zuckerberg's recent

19  public statements about misuse of Facebook's platform. On January 4, 2018, Mark Zuckerberg

20  posted the following on his own Facebook page:

21          Facebook has a lot of work to do – whether it's protecting our
           community from abuse and hate, *defending against interference by*
22          *nation states*, or making sure that time spent on Facebook is well
           spent. My personal challenge for 2018 is to focus on fixing these
23          important issues. We won't prevent all mistakes or abuse, *but we*
           *currently make too many errors enforcing our policies and*
24          *preventing misuse of our tools.* **If we're successful this year then**
           **we'll end 2018 on a much better trajectory . . . . These issues**
25          **touch on questions of history, civics, political philosophy, media,**
           **government, and of course technology** . . . . With the rise of a small
26          number of big tech companies – and governments using technology
           to watch their citizens – *many people now believe technology only*
27          *centralizes power rather than decentralizes it* . . . . I'm looking
           forward to learning from working to fix our issues together.

28  (Hagey Decl., **Ex. 23** (emphasis added).)

1    44.    This message echoes the statements Mr. Zuckerberg made during Facebook's

2    November 1, 2017 Third Quarter earnings call, during which he promised that Facebook would

3    make substantial investments to increase the "security and integrity" of its platform, with the aim

4    of, *inter alia*, stopping election meddling and removing false news and other problematic content.

5    (Hagey Decl., **Ex. 24** at 2.)  On the call, Mr. Zuckerberg stressed to investors that Facebook is

6    prioritizing "protecting our community" over "maximizing our profits."  (*Id.*)

7              **2.    Hun's Misconduct Is Ongoing and – As of Yet – Unchecked by**
                     **Facebook**

8    45.    Despite these well-intentioned pronouncements and terms, Hun's account(s) remain

9    active, and he continues to misuse Facebook in a manner which overtly violates Facebook's formal

10   Policies.  In doing so, Hun and the Cambodian regime undermine the social media site's goals of

11   facilitating valuable communication and generating meaningful connections.

12   46.    Just days ago, Hun posted on his Facebook page a video of one of his "political"

13   speeches where he threatened to kill Applicant.  (Hagey Decl., **Ex. 17A** ("Hun Sen delivered a fiery

14   speech yesterday, threatening to 'attack' members of the opposition with Soviet-era rocket

15   launchers, while also claiming he would arrest them anywhere in Asia.").)

16   47.    Hun stated: "'Please, don't have hope. I just want to tell you, don't force someone to

17   put nails in your coffin. If it's in the court's hands, it's another issue, but if it is a secession issue,

18   the BM-21 can be used to attack your area,' … referring to a Russian-made truck-mounted rocket

19   battery." (*Id.*)  Hun also personally threatened Applicant.  (*Id.*)  Such conduct is bullying,

20   intimidating, harassing, and threatening in violation of the Principles, Community Standards, and

21   Statement of Rights and Responsibilities Nos. 6 and 9. (Hagey Decl., **Exs. 21B-21C, 26**.)

22   48.    Hun's fake likes also violate Facebook Rule 9, which prohibits "misleading"

23   activities.  The same conduct also violates the Pages Terms, which "apply to all pages on

24   Facebook," and outlaw posting "false, misleading, fraudulent, or deceptive … content."  (Hagey

25   Decl., **Ex. 24A** (Facebook, *Pages Terms* (last revised March 30, 2017), available at

26   https://www.facebook.com/page_guidelines.php).)

27

28

49. As Facebook has explained: "Likes created by fake accounts or people without real intent are bad for people on Facebook, advertisers and Facebook itself." (Hagey Decl., **Ex. 16** (Keeping Activity Authentic Article).) Accordingly, Facebook has "increased [its] automated efforts to remove Likes on Pages that may have been gained by means that violate [its] Terms," and is "aggressively go[ing] after the bad actors behind fake likes." (Hagey Decl., **Ex. 24B** (Facebook, *Improvements to Our Site Integrity Systems* (Aug. 31, 2012), https://www.facebook.com/notes/facebook-security/improvements-to-our-site-integrity-systems/10151005934870766); (Hagey Decl., **Ex. 16 (**Keeping Activity Authentic Article).)

50. Similarly, Hun's use of his Facebook account to spread false news also violates Facebook Rule 9 against misleading conduct, as well as the core democratic ideals of Facebook.

51. To-date, Facebook has not taken any action to remediate or otherwise resolve the misuse of its site by Hun or his representatives and agents.

## ARGUMENT

### I. THE APPLICATION SATISFIES THE STATUTORY REQUIREMENTS OF SECTION 1782

52. Title 28, United States Code, Section 1782 is "the product of congressional efforts, over the span of nearly 150 years, to provide federal-court assistance in gathering evidence for use in foreign tribunals." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 247 (2004). Over time, Congress has "substantially broadened the scope of assistance federal courts could provide for foreign proceedings." *Id.* at 247-49. Section 1782(a) provides in relevant part:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal .... The order may be made ... upon the application of any interested person and may direct that the testimony or statement may be given, or the document or other thing be produced, before a person appointed by the court.

28 U.S.C. § 1782(a).

53. The statute sets forth three requirements: (1) the "person" from whom discovery is sought must reside or be found in the district of the court to which the application is made, (2) the request must be made "by a foreign or international tribunal or upon the application of any

1   interested person," and (3) the document or thing sought must be "for use in a proceeding in a

2   foreign or international tribunal." 28 U.S.C. § 1782(a).

3        54.    The Application meets all three statutory requirements. First, the Application has

4   been filed in the Northern District of California. This is "the district in which [the] person

5   resides," as Facebook is headquartered in Menlo Park, California. (Hagey Decl., **Ex. 25.**)

6   Although Facebook is a corporation, corporations are treated as persons under federal law. *Citizens*

7   *United v. Fed. Election Comm'n*, 558 U.S. 310 (2010) (corporations are persons under federal law).

8   Second, Applicant seeks the requested discovery "for use in a proceeding in a foreign ... tribunal,"

9   here, in Cambodia's domestic courts. (Sam Decl. ¶¶ 6-7, 11-12.) Third, Applicant qualifies as an

10  "interested person" because he is a defendant in the foreign proceedings at issue. (*Id.*)

11       **A.**    **Facebook Resides in the Northern District of California**

12       55.    Facebook is a Delaware corporation with its principal place of business in Menlo

13  Park, California. (Hagey Decl., **Ex. 25.**) Further, Facebook's terms of service specify that any

14  disputes with Facebook will be resolved "in the U.S. District Court for the Northern District of

15  California." (*Id.*, **Ex. 26** at § 15(1).) Facebook's terms of service also specify that its foreign users

16  "consent to having [their] personal data transferred to and processed in the United States." *Id.*, **Ex.**

17  **26** at § 16.

18       56.    Facebook is therefore "found" in the Northern District of California for purposes of

19  § 1782. *In re Ex Parte Application of Qualcomm Inc.*, 162 F. Supp. 3d 1029, 1035 (N.D. Cal.

20  2016) ("When considering a Section 1782 application . . . 'found' [when applied to corporations]

21  may safely be regarded as referring to judicial precedents that equate systematic and continuous

22  local activities with presence.").

23       **B.**    **Applicant is an "Interested Person" under § 1782**

24       57.    Applicant is an "interested person" under § 1782. *Intel Corp.*, 542 U.S. at 256

25  (2004) ("No doubt litigants are included among, and may be the most common example of, the

26  'interested person[s]' who may invoke § 1782…"). Applicant is a defendant and/or appellant in the

27  proceedings described above, and the requested documents are relevant to those foreign

28  proceedings and his ability to defend himself in those proceedings.

### C.    Materials Are Sought for Use in Connection with Foreign Proceedings

58.    The requested materials will be used in connection with foreign proceedings, including the Cambodian actions at issue.  The burden to show that the evidence sought is for use in a foreign proceeding is "de minimis."  *In re Veiga*, 746 F. Supp. 2d 8 (D.D.C. 2010) (granting Chevron's § 1782 application to obtain discovery from the plaintiffs' Ecuadorian attorney Alberto Wray based on the court's "independent review of the Applicants' prima facie showing and its conclusion that the discovery sought in fact relates to claims and defenses they intend to assert in good faith."); *In re Republic of Ecuador*, No. 1:10-MC-00040 GSA, 2010 WL 4027740 (E.D. Cal. Oct. 14, 2010) (granting a § 1782 application brought by the Republic of Ecuador where it made a "prima facie showing that the information it seeks . . . has, generally speaking, some relevance" to an international arbitration deciding alleged violations of Chevron's due process rights in a proceeding in Ecuador).

59.    And courts increasingly grant § 1782 applications in all types of informal and non-traditional proceedings including "investigating magistrates, administrative and arbitral tribunals, and quasi-judicial agencies."  *Intel*, 542 U.S. at 258.  Indeed, according to the Supreme Court, the foreign proceeding at issue must just be "within reasonable contemplation," not "pending" or "imminent." *Id.* at 247.

60.    Here, there are four proceedings in Cambodian courts against Applicant, and the requested discovery will be used to show that (i) the statements he has made on Facebook are true and therefore cannot be defamatory, and (ii) that Hun and his cronies are colluding to suppress Applicant's lawful opposition activities, including through false legal proceedings.  Applicant also is actively contemplating to initiate additional proceedings against Hun and his regime related to its numerous documented human rights abuses.

61.    Thus, the requested discovery easily satisfies the third element of § 1782.

### II.    THE SUPREME COURT'S *INTEL* FACTORS STRONGLY FAVOR GRANTING THIS APPLICATION

62.    In addition to the three statutory factors, the Supreme Court has set forth five additional factors – known as the *Intel* factors – to guide courts' consideration of § 1782 applications. *Intel*, 542 U.S. at 264-66.  Those factors are as follows: (a) the party from whom

1   discovery is sought is not a party to any of the foreign proceedings, (b) the information sought is

2   highly relevant to each of the proceedings, (c) there are no applicable foreign discovery restrictions,

3   (d) the applicant's discovery requests are not unduly burdensome, and (e) granting this discovery

4   would promote efficient discovery.  These factors all weigh in favor of granting this Application.

5        **A.     Facebook Is Not a Party to the Foreign Proceedings**

6        63.     Facebook is not a party to any of the foreign proceedings at issue.  (Sam Decl. ¶ 15.)

7        **B.     The Applicant Seeks Highly Relevant Information That Will Assist the Foreign
              Courts**

8

9        64.     Applicant's targeted discovery requests are relevant to the claims and defenses in

10  the cases that have been brought against him.  The requested discovery about Facebook's

11  investigations related to Hun and his cronies and complaints about Hun's account is likely to lead

12  to evidence regarding the validity of Hun's likes.  That information is relevant to Applicant's truth

13  defense in the defamation proceeding against him for stating that many of Hun's likes are fake.

14       65.     Applicant seeks discovery regarding Hun's communications with Som Soeun, who

15  has brought a suit against Applicant.  (Sam Decl. ¶¶ 6-7, 11-12.)  The evidence that he seeks

16  regarding the timing of Hun and Som's communications will show that they coordinated the case

17  Som filed against Applicant, and demonstrate bias.

18       66.     Similarly, Applicant seeks non-content evidence regarding Hun's communications

19  with Thy Sovantha, an individual Hun claims Applicant "defamed" when Applicant posted on

20  Facebook that she had accepted a $1 million bribe to stop supporting the CNRP and instead support

21  Hun's regime.  (*Id.* ¶ 12.)  The requested discovery will show that Applicant's statements are true

22  and therefore cannot be defamatory as truth is a complete defense to defamation claims in

23  Cambodia.  (*Id.* ¶ 17; **Ex. 7.**)  It will also show that Sovantha coordinated her accusations against

24  Applicant with Hun and his regime.

25       67.     Applicant's requested non-content discovery about communications between Hun

26  and his sons that are responsible for "security," "intelligence" and "policing" (Hun Manith, Hun

27  Manet and Dy Vichea) will show whether and when they were communicating among themselves

28  around the time that Dr. Kem Lay was assassinated.  This evidence will show that Hun was

responsible for this murder, which is relevant to Applicant's truth defense in the proceeding against him, which asserts that he "defamed" Hun by noting that Hun was responsible for the assassination.

68. For the same reasons, the non-content discovery Applicant seeks regarding Hun and his cronies' communications regarding Applicant, the legal cases against Applicant, the CNRP, Kem Sokha, and Dr. Kem Lay is all relevant to their coordination around all those activities. The requested evidence helps show that Hun and his cohorts orchestrated the proceedings against Applicant in a continuation of their efforts to suppress opposition activities and political speech – just as they have done in the past, and as they recently did with Kem Sokha and other CNRP members.

69. Applicant also seeks non-content information about communications between Hun and his family members which are the source of the prosecutions against him and at the heart of the parties' disputes. Hun and his family members, including those identified in the Application, have a well-documented history of colluding to cement their control over Cambodia's public and private sectors resulting in "Hun Sen having near-total control over the country."



1   (Hagey Decl., **Ex. 4** (Shaun Turton and Phak Seangly, *Inside the Hun Family's Business Empire*,

2   PHNOM PEN PENH POST, July 27, 2016, *available at* http://www.phnompenhpost.com/national-post-

3   depth-politics/inside-hun-familys-business-empire (Hun Family's Business Empire Article); *Id.,*

4   **Ex. 5** (*Hostile Takeover*, GLOBAL WITNESS (July 7, 2016),

5   https://www.globalwitness.org/en/reports/hostile-takeover/ (Global Witness Report)).)

6         70.     Finally, Lim Cheavutha has publicly admitted that he messages with Hun to

7   coordinate fake news stories emanating from his "independent" website. (Hagey Decl., **Ex. 15**

8   (Democracy Has Fallen Apart Article).)  Lim's articles are coordinated with Hun's false

9   prosecutions.  (*Id.* ("On Sept. 3, about a week after Fresh News first accused the Kem family of

10   having ties to the CIA, dozens of police pushed through the gates of Kem Sokha's family home in

11   Phnom Penh and arrested him. He was charged with treason and faces up to 30 years in prison.").)

12   And they would not be possible without a unified Facebook strategy.  (*Id.* (quoting Lim as stating

13   "Facebook is an absolute necessity for my site.").)  Such discovery is relevant to showing that the

14   prosecutions and press surrounding them are staged.[4]

15         **C.**     **No Foreign Discovery Restrictions Bar Applicant's Requested Discovery**

16         71.     A criminal defendant in a Cambodian litigation is entitled to seek discovery in aid

17   of his defense. (Sam Decl. ¶ 19; **Ex. 9**.)  Cambodia's Code of Civil Procedure also allows for

18   discovery, including motions to compel production from third parties, akin to the discovery devices

19   used in the United States.  (Sam Decl. ¶ 20; **Ex. 10**.)  For example, section 150 establishes a "duty

20   to disclose" documents, and section 152 provides: "Where the court determines that sufficient

21   grounds for an order to produce documents exist, the court shall issue a ruling ordering the holder

22   of the documents to produce such documents."

23         72.     Further, § 1782 can be used to seek discovery that is broader than that available in

24   the foreign forum.  In *Intel*, the Supreme Court stressed that district courts may compel discovery

25   of materials that cannot be discovered in foreign jurisdictions.  *Intel*, 542 U.S. at 259-63 ("Beyond

26   shielding material safeguarded by an applicable privilege . . . nothing in the text of § 1782 limits a

27

---

28  [4] Such evidence will also show that Hun has no regard for Facebook's policies. This tends to show that Hun's "likes" are fake.

1  district court's production-order authority to materials that could be discovered in the foreign

2  jurisdiction if the materials were located there").  And there is no requirement to first seek

3  discovery from the foreign court or to otherwise exhaust other options before applying to a district

4  court.  *In re Management Servs., Ltd.,* 2005 WL 1959702, at *3 (E.D.N.Y. Aug. 16, 2005) ("§ 1782

5  does not contain an exhaustion requirement that would impose upon an applicant a duty to first

6  seek the requested discovery from the foreign court") (citing *Application of Malev Hungarian*

7  *Airlines,* 964 F.2d 97, 100 (2d. Cir. 1992)).

8      **D.    The Requested Discovery Is Targeted to Avoid Undue Burden**

9      73.    The Applicant's discovery requests are targeted to documents and information

10  relevant to defending against the claims that have been asserted against him.  *See Supra* at § II(B).

11      **E.    Granting Applicant's § 1782 Request Would Promote Efficient Discovery**

12      74.    The discovery Applicant seeks is relevant in four separate foreign proceedings, each

13  with their own procedural posture and timelines.  An order compelling prompt disclosure of the

14  discovery sought would facilitate a prompt adjudication of these pending foreign proceedings.

15                                    **CONCLUSION**

16      For the reasons set forth above, Applicant respectfully requests that the Application be

17  granted.

18  Dated: February 8, 2018            BRAUNHAGEY & BORDEN LLP

19

20                                    J. Noah Hagey, Esq.

21                                    Attorneys for Applicant Sam Rainsy

22

23

24

25

26

27

28

                                    21