1    J. Noah Hagey, Esq. (SBN: 262331)
     hagey@braunhagey.com
2    Matthew Borden, Esq. (SBN: 214323)
     borden@braunhagey.com
3    BRAUNHAGEY & BORDEN LLP
     220 Sansome Street, Second Floor
4    San Francisco, CA 94104
     Telephone: (415) 599-0210
5    Facsimile: (415) 276-1808

6    Richard J. Rogers, Esq. (SBN: 189978)
     richardrogers@globaldiligence.com
7    GLOBAL DILIGENCE LLP
     Kemp House
8    152 City Rd
     London EC1V 2NX
9    UNITED KINGDOM
     Telephone: +44 (0)74 84822740
10

11    COUNSEL FOR APPLICANT SAM RAINSY

**FILED**

FEB 08 2018

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

SK

12

13           **UNITED STATES DISTRICT COURT**

14           **NORTHERN DISTRICT OF CALIFORNIA**

15    *In re* Ex Parte Application of

16    SAM RAINSY, an individual residing in France,

17        Applicant,

18    For an Order Pursuant to 28 U.S.C. § 1782
     Granting Leave to Obtain Discovery from
19

20    FACEBOOK, INC.,

21        Respondent,

22    For use in connection with Foreign Proceedings.

CV 18 80 024 MISC

Case No.

**DECLARATION OF SAM RAINSY IN
SUPPORT OF *EX PARTE* APPLICATION
FOR AN ORDER PURSUANT TO 28
U.S.C. § 1782 GRANTING LEAVE TO
OBTAIN DISCOVERY FOR USE IN
FOREIGN PROCEEDINGS**

23

24

25

26

27

28

1       I, Sam Rainsy, declare as follows:

2       1.      I am a founder and was the President of the Cambodian National Rescue Party (the

3   "CNRP"), the main opposition political party in Cambodia, until February 2017.  I remain an

4   outspoken opponent of Prime Minister Hun Sen's dictatorial tactics and the Cambodian

5   government.  I make this declaration based on personal knowledge. If called as a witness, I could,

6   and would, testify competently to the facts stated herein.

7       2.      As the leader of the Cambodian opposition, over the last twenty years I have faced a

8   series of threats, violence and intimidation from the current Cambodian Government, which

9   amount to political persecution. For example, in 1997, I was the victim of a grenade attack in

10  Phnom Penh, Cambodia, which killed sixteen people, including my body guard, and injured an

11  American citizen, Mr. Ronald Abney. I subsequently brought a case against Prime Minister Hun

12  Sen for masterminding that attack, both in the U.S. and in France. The case in France is pending.

13      3.      Over the last ten years, Prime Minister Hun Sen, his allies, and the Cambodian

14  government have filed a series of spurious lawsuits against me, utilizing the corrupt and compliant

15  prosecutorial and judicial authorities to pursue trumped-up charges. These actions are apparently

16  designed to curtail my ability to compete in democratic elections; the next national election is in

17  2018.  For example: In 2008, the Cambodian Foreign Minister, Mr. Hor Namhong, filed a criminal

18  defamation case against me in Cambodia. After a trial in absentia, which was widely seen as a

19  politicized show trial, on April 25, 2011, I was sentenced to two years in prison.  Two days later,

20  the highest court of France dismissed a case for defamation, also filed by Mr. Hor Namhong, that

21  was based on the same facts. The Cambodian sentence led to my exile in France.

22      4.      In 2013, the King of Cambodia pardoned me so that I could return and participate in

23  the 2013 national elections as leader of the opposition. However, in 2015, the National Assembly,

24  acting on a request by the Ministry of Justice, lifted my parliamentary immunity so that I would be

25  required to serve my two-year sentence from the April 25, 2011 judgment.  This led to my current

26  exile in France.

27      5.      On August 15, 2015, after comments, written by a third party, questioning the

28  authenticity of documents relating to Cambodia's border with Vietnam were posted on my

1  Facebook page, Prime Minister Hun Sen filed a case against me for complicity in forgery and

2  incitement.

3          6.        On March 10, 2016, following my exposure of Hun Sen's buying of fake "likes"

4  from "click farms" in countries like India and the Philippines for his Facebook page, a defamation

5  lawsuit was brought against me by Mr. Som Soeun, the manager of Hun Sen's Facebook page. Mr.

6  Som also holds the rank of government minister. I was found guilty on November 8, 2016. The

7  judgment was upheld in January 2017. I am seeking relief from Cambodia's Supreme Court. A

8  true and correct copy of a news article corroborating my claim that the likes on Prime Minister Hun

9  Sen's page were generated from click farms (where low paid workers in developing countries like

10  India and the Philippines create fake Facebook accounts and then artificially bolster likes,

11  followers, and views on profiles and posts) is attached hereto as **Exhibit 1** and can be found at

12  http://www.phnompenhpost.com/national/only-20-cent-pms-recent-facebook-likes-cambodia. A

13  true and correct copy of a news article describing the pending suit is attached hereto as **Exhibit 2**

14  and can be found at http://www.phnompenhpost.com/national/rainsy-faces-defamation-charge-

15  post-about-pms-likes.

16          7.        Following the assassination of Dr. Kem Ley, on July 13, 2016, I posted a Facebook

17  comment calling his murder "state-backed terrorism" and pointed out that "only the government

18  had the means and the capabilities to conduct such brazen attacks, to arrange for their cover-up and

19  to ensure a total impunity for the perpetrators and their mastermind." Shortly thereafter, on August

20  1, 2016, Hun Sen initiated another case against me claiming that my comments about Kem Ley's

21  murder amounted to defamation and the crime of incitement to commit a crime. On August 19,

22  2016, I was summoned to appear in court in Cambodia; I did not attend. On September 26, 2016,

23  the government announced that I am officially barred from re-entering Cambodia. I understand

24  this order is illegal, and am challenging it through my attorneys in Cambodia. I was convicted of

25  defamation and incitement and sentenced to twenty months in jail on March 30, 2017.

26          8.        On September 26, 2016, Hun Sen instructed the Cambodian Council of Ministers to

27  prevent me from returning to Cambodia. On October 12, 2016, the Council of Ministers announced

28  that I was banned from entering my home country, Cambodia. Letters were sent to all immigration

1 | authorities instructing them to prevent me from entering Cambodia. Letters were sent to all
2 | commercial airlines with routes to Cambodia, instructing them to prevent me from boarding and
3 | threatening to turn-back any plane carrying me to Cambodia.

4 |     9.    Over the course of 2016, I became aware of the arrests of approximately 20
5 | individuals aligned with the political opposition.  At least three were sentenced to 20-years in
6 | prison.

7 |     10.    On September 3, 2017, Kem Sokha, the acting President of the CNRP was arrested
8 | and imprisoned.  In November 2017, the Cambodian Supreme Court dissolved the CNRP and
9 | banned 118 of its members, including Mr. Kem, from politics for five years.  The decision was
10 | widely condemned by human rights organizations and even the United States White House and
11 | Senate.

12 |     11.    On December 7, 2017, the Cambodian government filed a criminal suit against me
13 | for incitement after I posted on Facebook that Cambodian soldiers should refrain from shooting
14 | peaceful protestors, even if they are ordered to do so.  True and correct copies of news articles
15 | describing the suit are attached hereto as **Exhibits 3** and **4**. These articles can be found at
16 | https://www.reuters.com/article/us-cambodia-politics/cambodias-sam-rainsy-to-be-sued-over-
17 | treasonous-call-to-soldiers-pm-idUSKBN1E00L3 and http://www.phnompenhpost.com/national-
18 | politics/incitement-complaint-filed-against-former-opposition-leader-sam-rainsy, respectively.

19 |     12.    On December 29, 2017, I was found guilty of defamation and fined the equivalent of
20 | $1 million USD for a Facebook post that stated Cambodian social media celebrity and former
21 | outspoken CNRP supporter Thy Sovantha had accepted a bribe from Hun Sen to switch parties and
22 | support his regime.  My post was based on leaked instant message conversations between Ms. Thy
23 | and Hun Sen.  The entire conversation was posted to Facebook and remains publicly available.  My
24 | Facebook post merely referenced the leaked conversation.  To my knowledge, Hun Sen did not sue
25 | the individuals who originally posted the leaked conversation to Facebook, while I have been
26 | ordered to pay the equivalent of $1 million USD for "defamation."  A true and correct copy of a
27 | news article describing the case is attached hereto as **Exhibit 5** and can be found at
28 | http://www.phnompenhpost.com/national-politics/rainsy-hit-latest-defamation-conviction-fined-

1   1m.  I plan to appeal.

2       13.     Even though I must live in exile in France, I do my best to share truthful and hopeful

3   information to the people living under Hun Sen's repressive regime any way I can, including over

4   Facebook.  Facebook is one of the most effective ways for me to reach people living in Cambodia.

5   Even relatively poor and uneducated Cambodians use Facebook to receive news and other

6   information.

7       14.     I plan to use the requested discovery to defend myself in the lawsuits that Hun Sen

8   and his allies have brought against me, to establish the Cambodian government's misuse of

9   Facebook, and for other contemplated proceedings related thereto.

10      15.     I am not presently involved in any litigation with Facebook, either as a plaintiff or a

11  defendant.

12      16.     Under Cambodian law, pursuant to the Cambodian Criminal Procedure Code

13  Articles 444-446, a party may submit evidence as part of his appeal.  Attached hereto as **Exhibit 6**

14  are true and correct copies of the relevant provisions.  The Cambodian Criminal Procedure Code is

15  available at https://www.oecd.org/site/adboecdanti-corruptioninitiative/46814242.pdf.

16      17.     Truth is a defense to defamation under Cambodian law.  Specifically, Cambodia's

17  Constitution establishes a right to freedom of expression and expressly enshrines the Universal

18  Declaration of Human Rights, which does the same.  Attached hereto as **Exhibit 7** are Articles 31

19  and 41 of the Constitution of Cambodia, which are also available at

20  https://www.constituteproject.org/constitution/Cambodia_2008.pdf?lang=en.

21      18.     Cambodia has also ratified the International Covenant on Civil and Political Rights

22  (ICCPR), which is an international treaty that imposes legal obligations on ratifying countries.  The

23  United Nations Human Rights Committee is charged with issuing interpretations of the treaty, and

24  has opined that under Article 19 of the ICCPR (dealing with Freedom of Expression), truth and

25  public interest should be defenses to defamation.  Attached hereto as **Exhibit 8** is a true and correct

26  copy of the U.N. Human Rights Committee, General Comment 34 dated Sept. 12, 2011, which is

27  also available at http://www2.ohchr.org/english/bodies/hrc/docs/gc34.pdf.

28

1      19.    A criminal defendant in Cambodia is entitled to seek discovery in aid of his defense

2  per Cambodian Code of Criminal Procedure Article 133.  Attached hereto as **Exhibit 9** is a true and

3  correct copy of the relevant provision.  It is also available at

4  http://cambodia.ohchr.org/~cambodiaohchr/sites/default/files/Annotated%20Cambodian%20Code

5  %20of%20Criminal%20Procedure%20%5BEN%5D%20%5BMaster%20-%20Final%5D.pdf

6      20.    Cambodia's Code of Civil Procedure Articles 148 through 160 allow for discovery,

7  including motions to compel production from third parties.  These provisions are akin to the

8  discovery devices used in the United States.  Attached hereto as **Exhibit 10** are true and correct

9  copies of the relevant provisions.  The Code of Civil Procedure is available at

10  http://sogi.sithi.org/admin/upload/media/145-ytztwvj1371009279.pdf.

11      I declare under penalty of perjury under the laws of the United States that the foregoing is

12  true and correct.

13

14  Dated: January 24, 2018        By:      _____

15                                 Sam Rainsy

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

Login   Register            Search 

# The Phnom Penh Post

Tue Jan 23 2018 16:12:42 GMT-0800 (Pacific Standard Time)

HOME   NATIONAL ▾   BUSINESS   POST LIFE ▾   OPINION   SUPPLEMENTS ▾   INTERNATIONAL   MULTIMEDIA   JOBS

    
SUBSCRIBE
Same day funds transfer
☎ 023 988 388
FORWARD ➤ Banking

# Only 20 per cent of PM's recent Facebook 'likes' from Cambodia

**Daniel Nass** and **Shaun Turton** | Publication date 09 March 2016 | 06:14 ICT

Shares  0   0







Days after Prime Minister Hun Sen surpassed 3 million fans on Facebook, an analysis of the premier's social media followers has found more than half the "likes" garnered by his page in the past month were from abroad – mostly from India and the Philippines – raising questions about their legitimacy.

The analysis, using data collected by social media analytics website socialbakers.com, shows that about 779,000 Facebook accounts "liked" Hun Sen in the past month but only 157,331 were located in Cambodia.

The biggest influx, 255,692, came from India, where a total of 332,475 Facebook accounts "like" Hun Sen.

Further, over the past 30 days, 98,256 accounts from the Philippines liked the premier, as did 54,972 from Myanmar, 46,368 from Indonesia, 26,527 from Brazil, 12,980 from Mexico, 4,783 from Turkey and 3,952 from the United Arab Emirates.

Overall, 591,717, or nearly 50 per cent, of Hun Sen's 1.2 million international followers were added in the past month.

After hitting 3 million followers, a post on Hun Sen's Facebook page said: "I would like to thank my national compatriots and youths in the country and



DELIVERING SOLUTIONS
PERSONAL FINANCING



RHB Home Loan
We help you own your dream home.

RHB Personal Loan
Get what you have always desired now.

RHB Car Loan
Drive your dream car today.



overseas who support my Facebook page, which has received 3 million likes as of 6:08pm (6 March).

"Facebook has brought me closer with people and allowed me to listen and receive more requests directly from them.

"Through Facebook, I have solved some problems quickly and effectively."

However, a Cambodia-based digital expert, who asked to remain anonymous, said the geographical distribution of Hun Sen's most recent Facebook followers called into question their validity.

"The only explanation is that they're not real," he said. "It doesn't happen that people [from other countries] out of the blue just start liking a page."

Likes can be bought for Facebook pages when owners want them to appear more popular than they actually are.

The likes are sold by companies using offshore "click farms", operations in which low-paid workers create fake accounts to help bolster likes, followers and views on social media profiles.

Facebook periodically purges fake accounts created by click farms, which past investigations have found in India, Indonesia, Bangladesh and the Philippines.

Suzie Shaw, managing director of Australia-based social media consultancy We Are Social, said "buying likes" was a dying practice.

"There's no question it happens, but it's something in the developed social media world that's becoming less common.

The benefits of doing it are not so high; you have to spend a lot of money to reach people who are not genuine fans . . . just phony numbers."

"I can see why a prime minister would do it, but it's so easy to detect. For a start, you can search for how many followers are in a constituency, which can be determined through analytics geographically, [for example] whether they're in Cambodia and if not, you'd have to ask in what way are they relevant?"

In recent months, Hun Sen and opposition leader Sam Rainsy have been vying for social media supremacy, with the premier lauding his dethroning of his rival as the "Prime Minister of Facebook", after surpassing his number of followers.

But, in fact, the data shows Rainsy's 1.83 million Cambodia-based fans outnumber Hun Sen's 1.73 million.

Sam Rainsy's in-country accounts make up 82 per cent of his fan base, with the bulk of the remainder based in Thailand, Myanmar, South Korea, the US and Vietnam.

Messages to the premier's Facebook page and website went unanswered yesterday.

Government spokesman Phay Siphan said he knew nothing of Hun Sen's Facebook likes, but stressed the prime minister was motivated by public service, not popularity, online.

"The purpose of using this platform is for good governance, two-way communication between his people and his administration . . . It's not [about] popularity, it's good governance . . . He enjoys popularity already, that's why he was elected by his people and by the National Assembly," Siphan said.

This, in fact, is borne out in the data from Socialbakers, which is used by companies including Toyota, Nestle and ING Bank.

The premier's page rates exceptionally high in terms of participation by Facebook users, averaging 1,800 interactions per 1,000 fans over the past month.

In the same period, posts on the page accrued 4.1 million likes, 106,000 comments and 533,000 shares.

In comparison, Rainsy averaged 558.4 interactions per 1,000 fans, 1.1 million likes, 15,100 comments and 133,000 shares.

Via email from France, the Cambodia National Rescue Party president said buying fake likes missed the point of social media.

"Any race to immediately collect the highest number of 'likes' is irrelevant when it comes to determining the real and lasting impact of your messages on Facebook," Rainsy said.

"With unlimited financial resources and a mobilisation of the state apparatus combined with some technical tricks, you can promote a page with staggering results. But how many of the artificial 'likes' collected that way are meaningful in terms of political and social impact?"

*Additional reporting by Chhay Channyda*

 Contact authors: Daniel Nass and Shaun Turton

## RECOMMENDED STORIES



### Breaking: PM says prominent human rights NGO 'must close'

Prime Minister Hun Sen has instructed the Interior Ministry to investigate the Cambodian Center for Human Rights (CCHR) and potentially close it "because they follow foreigners", appearing to link the rights group to the opposition Cambodia National Rescue Party's purported "revolution". The CNRP - the





### Government approves plan to relocate Phnom Penh's airport

The government has signed off on a proposal to build a new airport to serve Phnom Penh and has earmarked land in Kandal province for the $1.5 billion project. A new international airport to replace the existing Phnom Penh International Airport will be constructed on partially



### American convicted of raping boy, 10, in Siem Reap

A 79-year-old American man was sentenced to one year in prison for raping a 10-year-old boy by Siem Reap Provincial Court on Wednesday. John Paul Zollbrecht, of Washington state, was sentenced to one year in prison while a Cambodian man who helped facilitate the abuse, 23



### Cambodia: From pet project to problem child

As international condemnation began to pour in earlier this month lambasting the Supreme Court's decision to dissolve the country's largest opposition party, ruling party elites were quick to ask: Why us? In an op-ed published by the Khmer Times, ruling Cambodian People's



**The Phnom Penh Post**

Post Media Co Ltd
888 Building H, 8th Floor
Phnom Penh Center
Corner Sothearos & Sihanouk Blvd

Company
About us

Archives
7Days

Sections
Business

Sangkat Tonle Bassac
120101 Phnom Penh
Cambodia

Tel: +855(0) 23 214 3 11-17
Fax: +855(0) 23 214 318

Staff list
Advertising
Contact
Privacy policy
Refund Policy

LIFT
Siem Reap Insider

Lifestyle
National
Sport

Copyright © 2017 The Phnom Penh Post. All Rights Reserved.

# EXHIBIT 2

Login    Register           Search [                    ]

# The Phnom Penh Post

Tue Jan 23 2018 16:14:09 GMT-0800 (Pacific Standard Time)

HOME    NATIONAL ▾    BUSINESS    POST LIFE ▾    OPINION    SUPPLEMENTS ▾    INTERNATIONAL    MULTIMEDIA    JOBS

SUBSCRIBE
**Same day funds transfer**      📞 023 988 388  FORWARD ➤ Banking




# Rainsy faces defamation charge for post about PM's 'likes'

**Niem Chheng** and **Shaun Turton** | Publication date 11 March 2016 | 06:09 ICT

Shares  0  0

Recommend 122   Share          ✉ Email



Opposition leader Sam Rainsy last year speaks at a forum in France, where he is living in self-imposed exile to avoid pending defamation cases in Cambodia. Photo supplied



**CAMBODIA'S MOST EFFECTIVE MEDIUM OF ADVERTISING!**
BOOK YOUR AD SPACES NOW!
T: +855 (0) 12 898 631
E: rosaly.tin@phnompenhpost.com

Opposition leader Sam Rainsy has been hit with yet another defamation case for publishing instructions, purportedly from a CPP official, asking ruling party members to create Facebook accounts to bolster Prime Minister Hun Sen's fan base on the site.

On Wednesday, the Cambodia National Rescue Party president uploaded to his Facebook page a message purportedly from Hak Sok Makara, under-secretary of state at the Ministry of Water Resources and Meteorology, which relays instructions from Sam Soeun, a Cambodian People's Party cabinet member, for the party's rank-and-file.

Members are told to promote the premier's Facebook page at "all meetings", ensure all members "like" his page and "unlike" Rainsy's page, and to organise "technical working groups" to create accounts to "like" Hun Sen.

"These instructions clearly show that the ruling CPP is pushing – on a large scale – its officials, supporters and networks – including civil servants, policemen and soldiers – to create fake Facebook accounts in order to provide



**DELIVERING SOLUTIONS**
**PERSONAL FINANCING**



artificial 'likes' to Hun Sen's Facebook page," Rainsy's post alleges.

The post prompted Soeun, 64, to yesterday lodge a defamation complaint with the Phnom Penh Municipal Court, which demands $5,000 compensation for damaging his reputation and that of Hun Sen.

"On March 9 on the Sam Rainsy Facebook page, there was a post whose meaning was intended to defame me, saying I gave instructions to all subordinates, supporters, and networks including civil servant, polices and soldiers to create fake accounts in order to like the prime minister's page," the complaint, obtained by the *Post*, reads.

"The post also included a description, saying most of the 'likes' on Samdech's page are from buying 'likes' from poor people who are jobless… bought or hired to create fake Facebook account to give fake 'likes' to the prime minister's page.

"The post seriously affects the reputation of the national leader and myself."

Rainsy uploaded the message as part of a post highlighting a Wednesday story in the *Post*, which revealed that 80 per cent of the premier's recent Facebook "likes" originated abroad, including more than 255,000 from India.

Likes can be bought from firms that use click farms, where low-paid workers in developing countries create accounts. Rainsy alleged this was the case with Hun Sen's recent influx of international fans.

Soeun was unreachable yesterday, and CPP spokesman Sok Eysan said he had not heard of the lawsuit, but noted Soeun's right to protect his reputation.

He denied the party had ordered members to like Hun Sen's page and again rejected the assertion the premier had paid for likes from abroad.

"As we know, there are millions of CCP members; they came voluntarily to like without being instructed," he said.

Rainsy is in self-imposed exile to avoid prison for an eight-year-old defamation case brought by Foreign Minister Hor Namhong. National Assembly President Heng Samrin has also initiated a separate defamation suit.

Via email yesterday, the CNRP president welcomed the publicity.

"I would like to thank them [the CPP] for the advertisement they are making for my denouncing of their illegitimate Facebook tricks and maneuvers," Rainsy said.

Phnom Penh court president Taing Sunlay said no action had been taken yet.

"It depends on the prosecutor whether he will charge or not," Sunlay said.

 Contact authors: Niem Chheng and Shaun Turton

## RECOMMENDED STORIES





**Breaking: PM says prominent human rights NGO 'must close'**

Prime Minister Hun Sen has instructed the Interior Ministry to investigate the Cambodian Center for Human Rights (CCHR) and potentially close it "because they follow foreigners", appearing to link the rights group to the opposition Cambodia National Rescue Party's purported "revolution". The CNRP - the



**Government approves plan to relocate Phnom Penh's airport**

The government has signed off on a proposal to build a new airport to serve Phnom Penh and has earmarked land in Kandal province for the $1.5 billion project. A new international airport to replace the existing Phnom Penh International Airport will be constructed on partially



**American convicted of raping boy, 10, in Siem Reap**

A 79-year-old American man was sentenced to one year in prison for raping a 10-year-old boy by Siem Reap Provincial Court on Wednesday. John Paul Zollbrecht, of Washington state, was sentenced to one year in prison while a Cambodian man who helped facilitate the abuse, 23





### Cambodia: From pet project to problem child

As international condemnation began to pour in earlier this month lambasting the Supreme Court's decision to dissolve the country's largest opposition party, ruling party elites were quick to ask: Why us? In an op-ed published by the Khmer Times, ruling Cambodian People's



**The Phnom Penh Post**

**Post Media Co Ltd**
888 Building H, 8th Floor
Phnom Penh Center
Corner Sothearos & Sihanouk Blvd
Sangkat Tonle Bassac
120101 Phnom Penh
Cambodia

Tel: +855(0) 23 214 3 11-17
Fax: +855(0) 23 214 318
Copyright © 2017 The Phnom Penh Post. All Rights Reserved.

**Company**
About us
Staff list
Advertising
Contact
Privacy policy
Refund Policy

**Archives**
7Days
LIFT
Siem Reap Insider

**Sections**
Business
Lifestyle
National
Sport

# EXHIBIT 3

 REUTERS

Davos   The Trump Effect   Politics   North Korea   Technology   Myanmar   Future Of Money

**#WORLD NEWS**

DECEMBER 5, 2017 / 10:59 PM / 2 MONTHS AGO

# Cambodia's Sam Rainsy to be sued over 'treasonous' call to soldiers: PM

Prak Chan Thul



PHNOM PENH (Reuters) - Cambodia's exiled opposition leader Sam Rainsy has committed treason by inciting soldiers to defy orders, Prime Minister Hun Sen said on Wednesday, and he will face new legal action over the comments.





FILE PHOTO: Cambodian opposition leader Sam Rainsy answers questions during an interview with Reuters at a hotel in metro Manila, Philippines June 29, 2016. REUTERS/Romeo Ranoco/File Photo

The threat of more legal action against Sam Rainsy, who has lived in France since 2015 to avoid a series of convictions, comes weeks after a court dissolved his opposition party, removing any significant challenge to Hun Sen extending his decades-long rule in a general election next year.

The dissolution of the Cambodia National Rescue Party (CNRP) has been condemned by the opposition, rights groups and some Western countries as the most serious blow to democracy since an international peace deal and U.N.-run elections in the early 1990s ended decades of war and genocide.

The United States has withdrawn an offer to help fund the election and the European Union has raised the possibility of withdrawing trade preferences.



SPONSORED BY DELOITTE

## No-Collar Workforce

A new workforce and talent model that serves both machines and humans. Tech Trends 2018.

Learn more ›

Sam Rainsy, who stepped down as leader of the CNRP this year in what turned out to be a futile bid to forestall a ban on his party suggested in a video posted on his Facebook page on Tuesday that soldiers would not obey orders to shoot civilians. "Around the world, at any time, armed forces don't obey orders given by dictators to kill people and we say that Hun Sen is not immortal, we must not protect Hun Sen," Sam Rainsy told supporters in Paris.

Hun Sen, who has held power for more than 32 years, a said the military would file a lawsuit in response.

"This is a treasonous crime, an incitement of soldiers to disobey orders," Hun Sen told garment workers in Phnom Penh.

The Supreme Court banned the CNRP after its leader, Kem Sokha, who took over after Sam Rainsy stepped down, was arrested for allegedly plotting to overthrow the government with American help. Kem Sokha, who rejected the accusation, is in prison.

In an interview with Reuters last month, Sam Rainsy said Cambodia was at a "tipping point" and that Hun Sen would be driven from power like Zimbabwe's Robert Mugabe.

He urged Western states to impose targeted sanctions.

A government crackdown on dissent has included the prosecution of several rights activists, reporters and the closure of several media outlets.

Sam Rainsy served as finance minister in an ill-fated coalition set up when Hun Sen refused to give up power after losing a U.N.-organised election in 1993. Hun Sen purged his coalition partners in a 1997 putsch.

Hun Sen has built close ties to China and dismisses Western pressure to improve rights. He has warned of a return to civil war if he were to lose the election.

(This version of the story amends headline to show Hun Sen said the opposition leader would be sued)

Reporting by Prak Chan Thul; Editing by Amy Sawitta Lefevre and Robert Birsel

*Our Standards:*   *The Thomson Reuters Trust Principles.*

SPONSORED





 See How Some Retirees Use Options Trading As A Safe Way To Earn Income
TradeWins

 Bill Gates Says This Will Be Worth "10 Microsofts"
The Motley Fool

 How mortgage lenders still bait & switch refi borrowers
Better Mortgage Corporation

 RIAs: New Research Shows the "4% Rule" May Not Apply to Young Retirees
Capital Group

 Abenomics: A Work in Progress After Five Years
CME Group

 Here are the Savings Accounts Your Bank Doesn't Want You to Know About
smartasset

Promoted by **Dianomi**

Apps   Newsletters   Reuters Plus   Advertising Guidelines   Cookies   Terms of Use   Privacy



All quotes delayed a minimum of 15 minutes. See here for a complete list of exchanges and delays.

© 2018 Reuters. All Rights Reserved.

# EXHIBIT 4

    

# The Phnom Penh Post

Tue Jan 23 2018 17:03:10 GMT-0800 (Pacific Standard Time)

HOME    NATIONAL ▾    BUSINESS    POST LIFE ▾    OPINION    SUPPLEMENTS ▾    INTERNATIONAL    MULTIMEDIA    JOBS

SUBSCRIBE

# 'Incitement' complaint filed against former opposition leader Sam Rainsy

**Mech Dara** and **Andrew Nachemson** | Publication date 07 December 2017 | 15:43 ICT

Shares  0   0



Former opposition leader Sam Rainsy gives an interview on French TV5 Monde televison network on Monday in France. Photo supplied



A lawyer for the Royal Cambodian Armed Forces filed a complaint accusing former opposition leader Sam Rainsy of "incitement" yesterday, despite Prime Minister Hun Sen vowing on Wednesday to sue his long-time political opponent for "treason".

Vong Pheakdey, lawyer for the RCAF, told reporters that he "filed a complaint against Sam Rainsy for inciting the armed force to cause insecurity to the state".

Speaking outside of the Phnom Penh Municipal Court, Pheakdey said the suit stems from comments made in Paris on Saturday and later posted in a video to Rainsy's Facebook page on Tuesday. In the video and accompanying text, Rainsy urged the armed forces not to "shoot and kill innocent people", even if ordered to do so.

Hun Sen called the comments a "declaration of war".

But yesterday, Pheakdey said the complaint was "related to defamation and incitement to make the armed forces not obey leaders, who are the legitimate government".

The complaint does accuse Rainsy of threatening national security, but the word treason does not actually appear in the document.

"I would inform the prosecutor that in December 2017, Sam Rainsy incited the armed forces not to obey the orders of the legitimate head of the royal government," the complaint reads, adding that Rainsy's actions have "impacted state security".

"We hope that the court will take action urgently," Pheakdey added.



Military Commander-in-Chief Pol Saroeun speaks to the press at the Royal Cambodian Armed Forces headquarters in Phnom Penh where he vowed to formally accuse ex-opposition leader Sam Rainsy of treason over a recent Facebook post. 📷 Pann Rachana

Rainsy has been in self-imposed exile since 2015 to avoid a host of politically tinged convictions. Kem Sokha, Rainsy's successor as president of the party they co-founded, the Cambodia National Rescue Party, is currently awaiting trial on treason charges for saying he received advice from the US.

The CNRP – the only legitimate competitor to the long-ruling Cambodian People's Party – was dissolved last month by a near-universally condemned Supreme Court decision for allegedly fomenting a foreign-backed "revolution".

Despite the wording of the new complaint, government spokesman Phay Siphan said it was still the government's position that Rainsy committed treason.

"We do not take the law into our own hands," he said, explaining that it was up to the court to decide whether or not to charge him.

Former Deputy CNRP President Mu Sochua said treason charges would be "a total charade".

She said the lack of a specific complaint related to treason "shows even more they don't have a case".

Political analyst Meas Nee said Rainsy would be charged with treason if the government willed it, but with Rainsy abroad in France, he wondered what the point of the suit was. Calling Rainsy's remarks "extreme", Nee said the personal animus between Rainsy and Hun Sen is "nothing that could help this country out of the current political tension".

Rainsy, however, defended his comments as simply upholding "democracy and humanity".

"Begging soldiers not to shoot at and kill innocent people – including citizens from all walks of life who exercise their constitutional right to protest peacefully – is neither an act of treason nor an act of sedition."

*Updated Friday, 8 December, 6:50am*

 Contact authors: Mech Dara and Andrew Nachemson

## RECOMMENDED STORIES



### Breaking: PM says prominent human rights NGO 'must close'

Prime Minister Hun Sen has instructed the Interior Ministry to investigate the Cambodian Center for Human Rights (CCHR) and potentially close it "because they follow foreigners", appearing to link the rights group to the opposition Cambodia National Rescue Party's purported "revolution". The CNRP - the



### Government approves plan to relocate Phnom Penh's airport

The government has signed off on a proposal to build a new airport to serve Phnom Penh and has earmarked land in Kandal province for the $1.5 billion project. A new international airport to replace the existing Phnom Penh International Airport will be constructed on partially





**American convicted of raping boy, 10, in Siem Reap**

A 79-year-old American man was sentenced to one year in prison for raping a 10-year-old boy by Siem Reap Provincial Court on Wednesday. John Paul Zollbrecht, of Washington state, was sentenced to one year in prison while a Cambodian man who helped facilitate the abuse, 23



**Cambodia: From pet project to problem child**

As international condemnation began to pour in earlier this month lambasting the Supreme Court's decision to dissolve the country's largest opposition party, ruling party elites were quick to ask: Why us? In an op-ed published by the Khmer Times, ruling Cambodian People's



**Post Media Co Ltd**
888 Building H, 8th Floor
Phnom Penh Center
Corner Sothearos & Sihanouk Blvd
Sangkat Tonle Bassac
120101 Phnom Penh
Cambodia

Tel: +855(0) 23 214 3 11-17
Fax: +855(0) 23 214 318

**Company**
About us
Staff list
Advertising
Contact
Privacy policy
Refund Policy

**Archives**
7Days
LIFT
Siem Reap Insider

**Sections**
Business
Lifestyle
National
Sport

Copyright © 2017 The Phnom Penh Post. All Rights Reserved.

# EXHIBIT 5

Login   Register         Search

# The Phnom Penh Post

Tue Jan 23 2018 17:05:09 GMT-0800 (Pacific Standard Time)

HOME   NATIONAL ▾   BUSINESS   POST LIFE ▾   OPINION   SUPPLEMENTS ▾   INTERNATIONAL   MULTIMEDIA   JOBS

SUBSCRIBE

# Rainsy hit with latest defamation conviction, fined $1M

**Niem Chheng** and **Andrew Nachemson** | Publication date 29 December 2017 | 15:45 ICT

Shares  0  0


Social media star Thy Sovantha, seen speaking outside the Phnom Penh court earlier this year, won a defamation case against former opposition leader Sam Rainsy on Friday. 📷 Hong Menea


CAMBODIA'S MOST EFFECTIVE MEDIUM OF ADVERTISING!
BOOK YOUR AD SPACES NOW!
T: +855 (0) 12 898 631
E: rosaly.tin@phnompenhpost.com

Former opposition leader Sam Rainsy was found guilty of defamation and ordered to pay 4 billion riel (about $1 million) to Prime Minister Hun Sen on Friday for alleging that the premier bribed pro-government activist Thy Sovantha to attack the opposition.

The accusation stemmed from messages leaked from Sovantha's Facebook account between her and Hun Sen in November. The messages dealt with undermining the now-dissolved Cambodia National Rescue Party, with the prime minister calling Sovantha "grandchild" and offering her $1 million.

Sovantha claimed her page was hacked and the messages fabricated.

During Friday's hearing, the court played a 26-minute video from January of Rainsy speaking to Cambodian supporters in France.

"Hun Sen bribes Thy Sovantha $1 million . . . He bribed her to do bad things, to attack and cause trouble to the CNRP, to hold protests," Rainsy said in the clip.

Hun Sen was represented by Ky Tech, the same lawyer who represented the government last month in its case seeking the dissolution of the CNRP.

"What Sam Rainsy said was not true and it affects the reputation of Samdech Techo Hun Sen, the prime minister of Cambodia," Tech said.

Rainsy, who lives in self-exile in France to avoid a slew of similar convictions widely seen as politically motivated, was found guilty in absentia. His lawyer, Sam Sokong, challenged the validity of the verdict, in part because Sovantha was not present in the courtroom to testify.

"The prime minister is a public figure, and in a democratic society he should not mind criticism . . . The court should have the written statement of Thy Sovantha denying that, or summons her to testify here," he said.



Former opposition leader Sam Rainsy gives an interview on French TV5 Monde television network earlier this month in France. Photo supplied

Yoeurng Sotheara, legal expert at election watchdog Comfrel, said the latest conviction was "the same as the cases before" and "politically motivated".

"In a democracy with freedom expression . . . the right to express criticism to public figures is granted in the Constitution," Sotheara said.

"Not everything is defamation," he added.

Rainsy said in an email on Friday that he is "confident" the more than 400 leaked messages are legitimate, and could be proven so.

"If someone had wanted to invent something to discredit the concerned two persons, they would not have needed to fabricate so many fake messages," Rainsy said via email on Friday.

"Moreover, nobody apart from the two would have known so many details about their relationship . . . They have never been convincingly denied by Hun Sen."

Mu Sochua, the former opposition deputy president who fled the country in October, said the conviction against Rainsy would be another black eye on the justice system.

"These series of political cases will continue to make Cambodia a country known for its mockery of justice," she said by email. "Mr. Hun Sen has nothing to prove but his zero tolerance of true justice."

Updated: Monday 1 January 2017, 6:52am

Updated: Monday 1 January 2017, 0:52am

A previous version of this article misattributed a case to lawyer Ky Tech. It has now been updated. We apologise for the error.

 Contact authors: Niem Chheng and Andrew Nachemson

## RECOMMENDED STORIES



### Breaking: PM says prominent human rights NGO 'must close'

Prime Minister Hun Sen has instructed the Interior Ministry to investigate the Cambodian Center for Human Rights (CCHR) and potentially close it "because they follow foreigners", appearing to link the rights group to the opposition Cambodia National Rescue Party's purported "revolution". The CNRP - the



### Government approves plan to relocate Phnom Penh's airport

The government has signed off on a proposal to build a new airport to serve Phnom Penh and has earmarked land in Kandal province for the $1.5 billion project. A new international airport to replace the existing Phnom Penh International Airport will be constructed on partially





## American convicted of raping boy, 10, in Siem Reap

A 79-year-old American man was sentenced to one year in prison for raping a 10-year-old boy by Siem Reap Provincial Court on Wednesday. John Paul Zollbrecht, of Washington state, was sentenced to one year in prison while a Cambodian man who helped facilitate the abuse, 23



## Cambodia: From pet project to problem child

As international condemnation began to pour in earlier this month lambasting the Supreme Court's decision to dissolve the country's largest opposition party, ruling party elites were quick to ask: Why us? In an op-ed published by the Khmer Times, ruling Cambodian People's



The Phnom Penh Post

Post Media Co Ltd
888 Building H, 8th Floor
Phnom Penh Center
Corner Sothearos & Sihanouk Blvd
Sangkat Tonle Bassac
120101 Phnom Penh
Cambodia

Tel: +855(0) 23 214 3 11-17
Fax: +855(0) 23 214 318

**Company**
About us
Staff list
Advertising
Contact
Privacy policy
Refund Policy

**Archives**
7Days
LIFT
Siem Reap Insider

**Sections**
Business
Lifestyle
National
Sport

Copyright © 2017 The Phnom Penh Post. All Rights Reserved.

# EXHIBIT 6



**Kingdom of Cambodia**
**Nation Religion King**

# Criminal Procedure Code
# of
# Kingdom of Cambodia

# 2007

# Ministry of Justice

### Article 440.     Overrule without Referring the Dossier

When the act being charged is not an offense, the Supreme Court shall overrule the judgment of the Court of Appeal without referring the dossier.

### Article 441     Overrule with Referring the Dossier

When the Supreme Court finds that the act being charged is an offense different from that contains in the contested decision, but this offense has the same terms of sentence, the Supreme Court, without overruling, may modify the juristic of the new facts by maintaining the sentence which has been declared and civil part of the decision.

When the Supreme Court finds that the act being charged is an offense different from that contains in the contested decision and this offense has different sentence the Supreme Court shall overrule the judgment of the Court of Appeal and refer the dossier to a competent tribunal for adjudication.

### Article 442.     Judgment of Plenary Session

If a court which receives a referred dossier fails to follow the first judgment of the Supreme Court and if the same means are applied as basis for filing the second appeal, the Supreme Court which holds plenary session for adjudication shall make decision on fact and law by issuing a final judgment.

## TITLE 2
## MOTIONS FOR REVIEW OF PROCEEDING

### SINGLE CHAPTER
## Motion for Review of Proceeding

### Article 443.     Motion for Review

A motion for review is a way of contesting against a definitive and final order and judgment which has res judicata.

The plenary session of the Supreme Court shall have competence over motion for review.

### Article 444.     Motion for Review of Criminal Case

A motion for review may be filed in any criminal case regardless of the jurisdiction of the court and of sentences which have been pronounced.

### Article 445.     Review of Proceeding

A motion for review may be filed in the following cases:

1. If, after sentencing for a crime involving the human murder, there is a reliable lead which allows an assumption that a victim is still alive.
2. Where two accused persons have been sentenced for the same crime and the two sentences are not consistent with each other;
3. Where any witness was sentenced for giving false testimony against the accused person.

130

4. Where new facts, documents, or other new evidence is discovered which leads to reasonable doubt of the guilt of a convicted person.

### Article 446.    Persons Entitled to File a Motion for Review

The right to file a motion for review of a case shall rest with:

1. The Minister of Justice;
2. A convicted person or his/her legal representative if the convicted person is incapacitated;
3. The spouse, parents, children, or, generally, any person who has a material or psychological interest in the cancellation of the sentence if the convicted person has died or disappeared.

Before filing of an action with the Supreme Court, the Minister of Justice may request a Prosecutor General who has territorial jurisdiction to conduct further investigation.

### Article 447.    Registration of Motion for Review and Access to a Dossier

The motion for review shall be registered by the court clerk of the Supreme Court.

A person who applies for review or his/her lawyer may examine the dossier of the motion at the office of the court clerk of the Supreme Court. The lawyer may copy such dossier.

If the motion for review is made by the Minister of Justice, the dossier may be examined by the convicted person and his/her lawyer. If the convicted person has disappeared, the dossier may be examined by his/her spouse, parents, or children.

### Article 448.    Procedures of Review: Period of Time

The court clerk shall inform the petitioner that he/she has 30 (thirty) days to complete his/her motion. In exceptional cases, this period of time may be extended by the President of the Supreme Court.

At the expiration of this period of time, the President of the Supreme Court shall designate a reporting judge. After the report has been prepared, the dossier shall be referred to the Prosecutor General of the Supreme Court. The Prosecutor General, thereafter, shall prepare a written conclusion within 30 (thirty) days.

### Article 449.    Decision to Suspend the Enforcement of Sentence

The Criminal Chamber of the Supreme Court which received the motion for review may suspend the enforcement of the sentence if there are clear reasons.

### Article 450.    Referral of Motion for Review to the Supreme Court

If the Criminal Chamber decides that a motion for review is acceptable, the Chamber shall refer the dossier to the Supreme Court to hold a plenary hearing to decide on the law and the fact by issuing a final judgment.

### Article 451.    Notification of the Hearing Date and Publicity of the Confrontation

131

# EXHIBIT 7



constituteproject.org

# Cambodia's Constitution of 1993 with Amendments through 2008

This complete constitution has been generated from excerpts of texts from the repository of the Comparative Constitutions Project, and distributed on **constituteproject.org**.

• Power to pardon

## Article 27

The King shall have the rights to grant pardons or amnesties.

## Article 28

The King shall sign Royal proclamations promulgating the Constitution and laws passed by the National Assembly and completely reviewed by the Senate, and shall sign any Royal Decrees proposed by the Council of Ministers.

If the King is sick and requires medical treatment abroad, He has the rights to delegate the power of signing Royal proclamations and Royal Decrees to the Acting Head of State by delegating writs.

• Head of state powers

• Selection of active-duty commanders

## Article 29

The King establishes and confers national decorations. The King confers civil and military ranks and positions as determined by law.

## Article 30

In the absence of the King, the President of the Senate shall assume the duties of Acting Head of State. If the President of the Senate cannot perform his duties as the Acting Head of State in place of the King, at the time of the King's absence, the responsibilities of Acting Head of State shall be exercised in compliance with the second and third paragraphs of Article 11.

# Chapter III: The Rights and Obligations of Khmer Citizens

## Article 31

• International human rights treaties

The Kingdom of Cambodia recognizes and respects human rights as stipulated in the United Nations Charter, the Universal Declaration of Human Rights and the covenants and conventions related to human rights, women's rights and children's rights.

• General guarantee of equality
• Equality regardless of gender
• Equality regardless of skin color
• Equality regardless of social status
• Equality regardless of financial status
• Equality regardless of political party
• Equality regardless of origin
• Equality regardless of race
• Equality regardless of language
• Equality regardless of religion

Khmer citizens shall be equal before the law, enjoying the same rights and freedom and obligations regardless of race, color, sex, language, religious belief, political tendency, national origin, social status, wealth or other status. The exercise of personal rights and freedom by any individual shall not adversely affect the rights and freedom of others. The exercise of such rights and freedom shall be in accordance with the law.

• Right to life

## Article 32

Everybody shall have the rights to life, freedom, and personal security.

• Prohibition of capital punishment

Capital punishment is prohibited.

• Protection from unjustified restraint
• Principle of no punishment without law

No person shall be accused, arrested, or detained except in accordance with the law.

• Prohibition of cruel treatment

The coercion, physical ill-treatment or any other mistreatment which imposes additional punishment on a detainee or prisoner is prohibited. Persons who commit, participate in or conspire in such acts shall be punished according to the law.

• Regulation of evidence collection
• Prohibition of torture

Confessions obtained by physical or mental force shall not be admissible as evidence of guilt.

• Presumption of innocence in trials

The accused shall have the benefit of any reasonable doubt.

• Presumption of innocence in trials

Any accused shall be presumed to be innocent until they are finally convicted by the court.

• Right to counsel

Everybody shall have the rights to defend him/herself through the judicial system.

• Ultra-vires administrative actions
• Right of petition

## Article 39

Khmer citizens have the rights to denounce, make complaints, or claim for compensation for damages caused by any breach of the law by institutions of the state, social organizations or by members of such organizations. The settlement of complaints and claims for compensation for damages is the responsibility of the courts.

## Article 40

• Freedom of movement

The freedom of citizens to travel near and far and their rights to legal settlement shall be respected.

• Freedom of movement

Khmer citizens shall have the rights to settle abroad or return.

• Regulation of evidence collection
• Right to privacy
• Telecommunications

The rights to privacy of residence, and to the confidentiality of correspondence by mail, telegram, fax, telex and telephone, shall be guaranteed.

• Regulation of evidence collection
• Right to privacy

Any search of a house, personal property or a person shall be in accordance with the law.

• Freedom of assembly
• Freedom of expression
• State operation of the media
• Freedom of press

## Article 41

Khmer citizens shall have freedom of expression of their ideas, freedom of information, freedom of publication and freedom of assembly. No one shall exercise these rights to infringe upon the honor of others, or to affect the good customs of society, public order and national security.

The regime of the media shall be determined by law.

• Freedom of association
• Restrictions on political parties
• Right to form political parties

## Article 42

Khmer Citizens have the rights to establish associations and political parties. These rights shall be determined by law.

Khmer citizens may take part in mass organizations to work together to protect national achievement and social order.

• Freedom of religion
• Freedom of opinion/thought/conscience

## Article 43

Khmer citizens of either sex shall have the rights to freedom of belief.

Freedom of belief and religious worship shall be guaranteed by the State on the condition that such freedom does not affect other beliefs and religions or violate public order and security.

# EXHIBIT 8

United Nations

**CCPR**/C/GC/34



**International Covenant on
Civil and Political Rights**

Distr.: General
12 September 2011

Original: English

**Human Rights Committee**
**102nd session**
Geneva, 11-29 July 2011

## General comment No. 34

### Article 19: Freedoms of opinion and expression

#### General remarks

1.      This general comment replaces general comment No. 10 (nineteenth session).

2.      Freedom of opinion and freedom of expression are indispensable conditions for the full development of the person. They are essential for any society.[1] They constitute the foundation stone for every free and democratic society. The two freedoms are closely related, with freedom of expression providing the vehicle for the exchange and development of opinions.

3.      Freedom of expression is a necessary condition for the realization of the principles of transparency and accountability that are, in turn, essential for the promotion and protection of human rights.

4.      Among the other articles that contain guarantees for freedom of opinion and/or expression, are articles 18, 17, 25 and 27. The freedoms of opinion and expression form a basis for the full enjoyment of a wide range of other human rights. For instance, freedom of expression is integral to the enjoyment of the rights to freedom of assembly and association, and the exercise of the right to vote.

5.      Taking account of the specific terms of article 19, paragraph 1, as well as the relationship of opinion and thought (article 18), a reservation to paragraph 1 would be incompatible with the object and purpose of the Covenant.[2] Furthermore, although freedom of opinion is not listed among those rights that may not be derogated from pursuant to the provisions of article 4 of the Covenant, it is recalled that, "in those provisions of the Covenant that are not listed in article 4, paragraph 2, there are elements that in the

---

[1]   See communication No. 1173/2003, *Benhadj v. Algeria*, Views adopted on 20 July 2007; No. 628/1995, *Park v. Republic of Korea*, Views adopted on 5 July 1996.

[2]   See the Committee's general comment No. 24 (1994) on issues relating to reservations made upon ratification or accession to the Covenant or the Optional Protocols thereto, or in relation to the declarations under article 41 of the Covenant, *Official Records of the General Assembly, Fiftieth Session, Supplement No. 40*, vol. I (A/50/40 (Vol. I)), annex V.

Please recycle

Committee's opinion cannot be made subject to lawful derogation under article 4".[3] Freedom of opinion is one such element, since it can never become necessary to derogate from it during a state of emergency.[4]

6.      Taking account of the relationship of freedom of expression to the other rights in the Covenant, while reservations to particular elements of article 19, paragraph 2, may be acceptable, a general reservation to the rights set out in paragraph 2 would be incompatible with the object and purpose of the Covenant.[5]

7.      The obligation to respect freedoms of opinion and expression is binding on every State party as a whole. All branches of the State (executive, legislative and judicial) and other public or governmental authorities, at whatever level – national, regional or local – are in a position to engage the responsibility of the State party.[6] Such responsibility may also be incurred by a State party under some circumstances in respect of acts of semi-State entities.[7] The obligation also requires States parties to ensure that persons are protected from any acts by private persons or entities that would impair the enjoyment of the freedoms of opinion and expression to the extent that these Covenant rights are amenable to application between private persons or entities.[8]

8.      States parties are required to ensure that the rights contained in article 19 of the Covenant are given effect to in the domestic law of the State, in a manner consistent with the guidance provided by the Committee in its general comment No. 31 on the nature of the general legal obligation imposed on States parties to the Covenant. It is recalled that States parties should provide the Committee, in accordance with reports submitted pursuant to article 40, with the relevant domestic legal rules, administrative practices and judicial decisions, as well as relevant policy level and other sectorial practices relating to the rights protected by article 19, taking into account the issues discussed in the present general comment. They should also include information on remedies available if those rights are violated.

## Freedom of opinion

9.      Paragraph 1 of article 19 requires protection of the right to hold opinions without interference. This is a right to which the Covenant permits no exception or restriction. Freedom of opinion extends to the right to change an opinion whenever and for whatever reason a person so freely chooses. No person may be subject to the impairment of any rights under the Covenant on the basis of his or her actual, perceived or supposed opinions. All forms of opinion are protected, including opinions of a political, scientific, historic, moral or religious nature. It is incompatible with paragraph 1 to criminalize the holding of an opinion.[9] The harassment, intimidation or stigmatization of a person, including arrest,

---

[3]  See the Committee's general comment No. 29 (2001) on derogation during a state of emergency, para. 13, *Official Records of the General Assembly, Fifty-sixth Session, Supplement No. 40*, vol. I (A/56/40 (Vol. I)), annex VI.

[4]  General comment No. 29, para. 11.

[5]  General comment No. 24.

[6]  See the Committee's general comment No. 31 (2004) on the nature of the general legal obligation imposed on States parties to the Covenant, para. 4, *Official Records of the General Assembly, Fifty-ninth Session, Supplement No. 40*, vol. I (A/59/40 (Vol. I)), annex III

[7]  See communication No. 61/1979, *Hertzberg et al. v. Finland*, Views adopted on 2 April 1982.

[8]  General comment No. 31, para. 8; See communication No. 633/1995, *Gauthier v. Canada*, Views adopted on 7 April 1999.

[9]  See communication No. 550/93, *Faurisson v. France*, Views adopted on 8 November 1996.

detention, trial or imprisonment for reasons of the opinions they may hold, constitutes a violation of article 19, paragraph 1.[10]

10.    Any form of effort to coerce the holding or not holding of any opinion is prohibited.[11] Freedom to express one's opinion necessarily includes freedom not to express one's opinion.

## Freedom of expression

11.    Paragraph 2 requires States parties to guarantee the right to freedom of expression, including the right to seek, receive and impart information and ideas of all kinds regardless of frontiers. This right includes the expression and receipt of communications of every form of idea and opinion capable of transmission to others, subject to the provisions in article 19, paragraph 3, and article 20.[12] It includes political discourse,[13] commentary on one's own[14] and on public affairs,[15] canvassing,[16] discussion of human rights,[17] journalism,[18] cultural and artistic expression,[19] teaching,[20] and religious discourse.[21] It may also include commercial advertising. The scope of paragraph 2 embraces even expression that may be regarded as deeply offensive,[22] although such expression may be restricted in accordance with the provisions of article 19, paragraph 3 and article 20.

12.    Paragraph 2 protects all forms of expression and the means of their dissemination. Such forms include spoken, written and sign language and such non-verbal expression as images and objects of art.[23] Means of expression include books, newspapers,[24] pamphlets,[25] posters, banners,[26] dress and legal submissions.[27] They include all forms of audio-visual as well as electronic and internet-based modes of expression.

## Freedom of expression and the media

13.    A free, uncensored and unhindered press or other media is essential in any society to ensure freedom of opinion and expression and the enjoyment of other Covenant rights. It constitutes one of the cornerstones of a democratic society.[28] The Covenant embraces a

---

[10]  See communication No. 157/1983, *Mpaka-Nsusu v. Zaire*, Views adopted on 26 March 1986; No. 414/1990, *Mika Miha v. Equatorial Guinea*, Views adopted on 8 July 1994.

[11]  See communication No. 878/1999, *Kang v. Republic of Korea*, Views adopted on 15 July 2003.

[12]  See communications Nos. 359/1989 and 385/1989, *Ballantyne, Davidson and McIntyre v. Canada*, Views adopted on 18 October 1990.

[13]  See communication No. 414/1990, *Mika Miha v. Equatorial Guinea*.

[14]  See communication No. 1189/2003, *Fernando v. Sri Lanka*, Views adopted on 31 March 2005.

[15]  See communication No. 1157/2003, *Coleman v. Australia*, Views adopted on 17 July 2006.

[16]  Concluding observations on Japan (CCPR/C/JPN/CO/5).

[17]  See communication No. 1022/2001, *Velichkin v. Belarus*, Views adopted on 20 October 2005.

[18]  See communication No. 1334/2004, *Mavlonov and Sa'di v. Uzbekistan*, Views adopted on 19 March 2009.

[19]  See communication No. 926/2000, *Shin v. Republic of Korea*, Views adopted on 16 March 2004.

[20]  See communication No. 736/97, *Ross v. Canada*, Views adopted on 18 October 2000.

[21]  Ibid.

[22]  Ibid.

[23]  See communication No. 926/2000, *Shin v. Republic of Korea*.

[24]  See communication No. 1341/2005, *Zundel v. Canada*, Views adopted on 20 March 2007.

[25]  See communication No. 1009/2001, *Shchetoko et al. v. Belarus*, Views adopted on 11 July 2006.

[26]  See communication No. 412/1990, *Kivenmaa v. Finland*, Views adopted on 31 March 1994.

[27]  See communication No. 1189/2003, *Fernando v. Sri Lanka*.

[28]  See communication No. 1128/2002, *Marques v. Angola*, Views adopted on 29 March 2005.

right whereby the media may receive information on the basis of which it can carry out its function.[29] The free communication of information and ideas about public and political issues between citizens, candidates and elected representatives is essential. This implies a free press and other media able to comment on public issues without censorship or restraint and to inform public opinion.[30] The public also has a corresponding right to receive media output.[31]

14.    As a means to protect the rights of media users, including members of ethnic and linguistic minorities, to receive a wide range of information and ideas, States parties should take particular care to encourage an independent and diverse media.

15.    States parties should take account of the extent to which developments in information and communication technologies, such as internet and mobile based electronic information dissemination systems, have substantially changed communication practices around the world. There is now a global network for exchanging ideas and opinions that does not necessarily rely on the traditional mass media intermediaries. States parties should take all necessary steps to foster the independence of these new media and to ensure access of individuals thereto.

16.    States parties should ensure that public broadcasting services operate in an independent manner.[32] In this regard, States parties should guarantee their independence and editorial freedom. They should provide funding in a manner that does not undermine their independence.

17.    Issues concerning the media are discussed further in the section of this general comment that addresses restrictions on freedom of expression.

## Right of access to information

18.    Article 19, paragraph 2 embraces a right of access to information held by public bodies. Such information includes records held by a public body, regardless of the form in which the information is stored, its source and the date of production. Public bodies are as indicated in paragraph 7 of this general comment. The designation of such bodies may also include other entities when such entities are carrying out public functions. As has already been noted, taken together with article 25 of the Covenant, the right of access to information includes a right whereby the media has access to information on public affairs[33] and the right of the general public to receive media output.[34] Elements of the right of access to information are also addressed elsewhere in the Covenant. As the Committee observed in its general comment No. 16, regarding article 17 of the Covenant, every individual should have the right to ascertain in an intelligible form, whether, and if so, what personal data is stored in automatic data files, and for what purposes. Every individual should also be able to ascertain which public authorities or private individuals or bodies control or may control his or her files. If such files contain incorrect personal data or have been collected or processed contrary to the provisions of the law, every individual should have the right to have his or her records rectified. Pursuant to article 10 of the Covenant, a prisoner does not

---

[29] See communication No. 633/95, *Gauthier v. Canada.*

[30] See the Committee's general comment No. 25 (1996) on article 25 (Participation in public affairs and the right to vote), para. 25, *Official Records of the General Assembly, Fifty-first Session, Supplement No. 40*, vol. I (A/51/40 (Vol. I)), annex V.

[31] See communication No. 1334/2004, *Mavlonov and Sa'di v. Uzbekistan.*

[32] Concluding observations on Republic of Moldova (CCPR/CO/75/MDA).

[33] See communication No. 633/95, *Gauthier v. Canada.*

[34] See communication No. 1334/2004, *Mavlonov and Sa'di v. Uzbekistan.*

lose the entitlement to access to his medical records.[35] The Committee, in general comment No. 32 on article 14, set out the various entitlements to information that are held by those accused of a criminal offence.[36] Pursuant to the provisions of article 2, persons should be in receipt of information regarding their Covenant rights in general.[37] Under article 27, a State party's decision-making that may substantively compromise the way of life and culture of a minority group should be undertaken in a process of information-sharing and consultation with affected communities.[38]

19.     To give effect to the right of access to information, States parties should proactively put in the public domain Government information of public interest. States parties should make every effort to ensure easy, prompt, effective and practical access to such information. States parties should also enact the necessary procedures, whereby one may gain access to information, such as by means of freedom of information legislation.[39] The procedures should provide for the timely processing of requests for information according to clear rules that are compatible with the Covenant. Fees for requests for information should not be such as to constitute an unreasonable impediment to access to information. Authorities should provide reasons for any refusal to provide access to information. Arrangements should be put in place for appeals from refusals to provide access to information as well as in cases of failure to respond to requests.

## Freedom of expression and political rights

20.     The Committee, in general comment No. 25 on participation in public affairs and the right to vote, elaborated on the importance of freedom of expression for the conduct of public affairs and the effective exercise of the right to vote. The free communication of information and ideas about public and political issues between citizens, candidates and elected representatives is essential. This implies a free press and other media able to comment on public issues and to inform public opinion without censorship or restraint.[40] The attention of States parties is drawn to the guidance that general comment No. 25 provides with regard to the promotion and the protection of freedom of expression in that context.

## The application of article 19 (3)

21.     Paragraph 3 expressly states that the exercise of the right to freedom of expression carries with it special duties and responsibilities. For this reason two limitative areas of restrictions on the right are permitted, which may relate either to respect of the rights or reputations of others or to the protection of national security or of public order (*ordre public*) or of public health or morals. However, when a State party imposes restrictions on the exercise of freedom of expression, these may not put in jeopardy the right itself. The Committee recalls that the relation between right and restriction and between norm and exception must not be reversed.[41] The Committee also recalls the provisions of article 5,

---

[35] See communication No. 726/1996, *Zheludkov v. Ukraine*, Views adopted on 29 October 2002.

[36] See the Committee's general comment No. 32 (2007) on the right to equality before courts and tribunals and to a fair trial, para. 33, *Official Records of the General Assembly, Sixty-second Session, Supplement No. 40, vol. I (A/62/40 (Vol. I)), annex VI*

[37] General comment No. 31.

[38] See communication No. 1457/2006, *Poma v. Peru*, Views adopted on 27 March 2009.

[39] Concluding observations on Azerbaijan (CCPR/C/79/Add.38 (1994)).

[40] See General comment No. 25 on article 25 of the Covenant, para. 25.

[41] See the Committee's general comment No. 27 on article 12, *Official Records of the General Assembly, Fifty-fifth Session, Supplement No. 40*, vol. I (A/55/40 (Vol. I)), annex VI, sect. A

paragraph 1, of the Covenant according to which "nothing in the present Covenant may be interpreted as implying for any State, group or person any right to engage in any activity or perform any act aimed at the destruction of any of the rights and freedoms recognized herein or at their limitation to a greater extent than is provided for in the present Covenant".

22.     Paragraph 3 lays down specific conditions and it is only subject to these conditions that restrictions may be imposed: the restrictions must be "provided by law"; they may only be imposed for one of the grounds set out in subparagraphs (a) and (b) of paragraph 3; and they must conform to the strict tests of necessity and proportionality.[42] Restrictions are not allowed on grounds not specified in paragraph 3, even if such grounds would justify restrictions to other rights protected in the Covenant. Restrictions must be applied only for those purposes for which they were prescribed and must be directly related to the specific need on which they are predicated.[43]

23.     States parties should put in place effective measures to protect against attacks aimed at silencing those exercising their right to freedom of expression. Paragraph 3 may never be invoked as a justification for the muzzling of any advocacy of multi-party democracy, democratic tenets and human rights.[44] Nor, under any circumstance, can an attack on a person, because of the exercise of his or her freedom of opinion or expression, including such forms of attack as arbitrary arrest, torture, threats to life and killing, be compatible with article 19.[45] Journalists are frequently subjected to such threats, intimidation and attacks because of their activities.[46] So too are persons who engage in the gathering and analysis of information on the human rights situation and who publish human rights-related reports, including judges and lawyers.[47] All such attacks should be vigorously investigated in a timely fashion, and the perpetrators prosecuted,[48] and the victims, or, in the case of killings, their representatives, be in receipt of appropriate forms of redress.[49]

24.     Restrictions must be provided by law. Law may include laws of parliamentary privilege[50] and laws of contempt of court.[51] Since any restriction on freedom of expression constitutes a serious curtailment of human rights, it is not compatible with the Covenant for a restriction to be enshrined in traditional, religious or other such customary law.[52]

25.     For the purposes of paragraph 3, a norm, to be characterized as a "law", must be formulated with sufficient precision to enable an individual to regulate his or her conduct accordingly[53] and it must be made accessible to the public. A law may not confer unfettered discretion for the restriction of freedom of expression on those charged with its execution.[54]

---

[42]   See communication No. 1022/2001, *Velichkin v. Belarus*, Views adopted on 20 October 2005.
[43]   See the Committee's general comment No. 22, *Official Records of the General Assembly, Forty-eighth Session, Supplement No. 40* (A/48/40), annex VI
[44]   See communication No. 458/91, *Mukong v. Cameroon*, Views adopted on 21 July 1994.
[45]   See communication No. 1353/2005, *Njaru v. Cameroon*, Views adopted on 19 March 2007.
[46]   See, for instance, concluding observations on Algeria (CCPR/C/DZA/CO/3); concluding observations on Costa Rica (CCPR/C/CRI/CO/5); concluding observations on Sudan (CCPR/C/SDN/CO/3).
[47]   See communication No. 1353/2005, *Njaru v. Cameroon* ; concluding observations on Nicaragua (CCPR/C/NIC/CO/3); concluding observations on Tunisia (CCPR/C/TUN/CO/5); concluding observations on the Syrian Arab Republic (CCPR/CO/84/SYR); concluding observations on Colombia (CCPR/CO/80/COL).
[48]   Ibid. and concluding observations on Georgia (CCPR/C/GEO/CO/3).
[49]   Concluding observations on Guyana (CCPR/C/79/Add.121).
[50]   See communication No. 633/95, *Gauthier v. Canada*.
[51]   See communication No. 1373/2005, *Dissanayake v. Sri Lanka*, Views adopted on 22 July 2008.
[52]   See general comment No. 32.
[53]   See communication No. 578/1994, *de Groot v. The Netherlands*, Views adopted on 14 July 1995.
[54]   See general comment No. 27.

Laws must provide sufficient guidance to those charged with their execution to enable them to ascertain what sorts of expression are properly restricted and what sorts are not.

26.     Laws restricting the rights enumerated in article 19, paragraph 2, including the laws referred to in paragraph 24, must not only comply with the strict requirements of article 19, paragraph 3 of the Covenant but must also themselves be compatible with the provisions, aims and objectives of the Covenant.[55] Laws must not violate the non-discrimination provisions of the Covenant. Laws must not provide for penalties that are incompatible with the Covenant, such as corporal punishment.[56]

27.     It is for the State party to demonstrate the legal basis for any restrictions imposed on freedom of expression.[57] If, with regard to a particular State party, the Committee has to consider whether a particular restriction is imposed by law, the State party should provide details of the law and of actions that fall within the scope of the law.[58]

28.     The first of the legitimate grounds for restriction listed in paragraph 3 is that of respect for the rights or reputations of others. The term "rights" includes human rights as recognized in the Covenant and more generally in international human rights law. For example, it may be legitimate to restrict freedom of expression in order to protect the right to vote under article 25, as well as rights article under 17 (see para. 37).[59] Such restrictions must be constructed with care: while it may be permissible to protect voters from forms of expression that constitute intimidation or coercion, such restrictions must not impede political debate, including, for example, calls for the boycotting of a non-compulsory vote.[60] The term "others" relates to other persons individually or as members of a community.[61] Thus, it may, for instance, refer to individual members of a community defined by its religious faith[62] or ethnicity.[63]

29.     The second legitimate ground is that of protection of national security or of public order (ordre public), or of public health or morals.

30.     Extreme care must be taken by States parties to ensure that treason laws[64] and similar provisions relating to national security, whether described as official secrets or sedition laws or otherwise, are crafted and applied in a manner that conforms to the strict requirements of paragraph 3. It is not compatible with paragraph 3, for instance, to invoke such laws to suppress or withhold from the public information of legitimate public interest that does not harm national security or to prosecute journalists, researchers, environmental activists, human rights defenders, or others, for having disseminated such information.[65] Nor is it generally appropriate to include in the remit of such laws such categories of information as those relating to the commercial sector, banking and scientific progress.[66] The Committee has found in one case that a restriction on the issuing of a statement in

[55] See communication No. 488/1992, *Toonen v. Australia*, Views adopted on 30 March 1994.
[56] General comment No. 20, *Official Records of the General Assembly, Forty-seventh Session, Supplement No. 40 (A/47/40), annex VI, sect. A.*
[57] See communication No. 1553/2007, *Korneenko et al. v. Belarus*, Views adopted on 31 October 2006.
[58] See communication No. 132/1982, *Jaona v. Madagascar*, Views adopted on 1 April 1985.
[59] See communication No. 927/2000, *Svetik v. Belarus*, Views adopted on 8 July 2004.
[60] Ibid.
[61] See communication No. 736/97, *Ross v. Canada*, Views adopted on 18 October 2000.
[62] See communication No. 550/93, *Faurisson v. France*; concluding observations on Austria (CCPR/C/AUT/CO/4).
[63] Concluding observations on Slovakia (CCPR/CO/78/SVK); concluding observations on Israel (CCPR/CO/78/ISR).
[64] Concluding observations on Hong Kong (CCPR/C/HKG/CO/2).
[65] Concluding observations on the Russian Federation (CCPR/CO/79/RUS).
[66] Concluding observations on Uzbekistan (CCPR/CO/71/UZB).

support of a labour dispute, including for the convening of a national strike, was not permissible on the grounds of national security.[67]

31.     On the basis of maintenance of public order (*ordre public*) it may, for instance, be permissible in certain circumstances to regulate speech-making in a particular public place.[68] Contempt of court proceedings relating to forms of expression may be tested against the public order (*ordre public*) ground. In order to comply with paragraph 3, such proceedings and the penalty imposed must be shown to be warranted in the exercise of a court's power to maintain orderly proceedings.[69] Such proceedings should not in any way be used to restrict the legitimate exercise of defence rights.

32.     The Committee observed in general comment No. 22, that "the concept of morals derives from many social, philosophical and religious traditions; consequently, limitations... for the purpose of protecting morals must be based on principles not deriving exclusively from a single tradition". Any such limitations must be understood in the light of universality of human rights and the principle of non-discrimination

33.     Restrictions must be "necessary" for a legitimate purpose. Thus, for instance, a prohibition on commercial advertising in one language, with a view to protecting the language of a particular community, violates the test of necessity if the protection could be achieved in other ways that do not restrict freedom of expression.[70] On the other hand, the Committee has considered that a State party complied with the test of necessity when it transferred a teacher who had published materials that expressed hostility toward a religious community to a non-teaching position in order to protect the right and freedom of children of that faith in a school district.[71]

34.     Restrictions must not be overbroad. The Committee observed in general comment No. 27 that "restrictive measures must conform to the principle of proportionality; they must be appropriate to achieve their protective function; they must be the least intrusive instrument amongst those which might achieve their protective function; they must be proportionate to the interest to be protected...The principle of proportionality has to be respected not only in the law that frames the restrictions but also by the administrative and judicial authorities in applying the law".[72] The principle of proportionality must also take account of the form of expression at issue as well as the means of its dissemination. For instance, the value placed by the Covenant upon uninhibited expression is particularly high in the circumstances of public debate in a democratic society concerning figures in the public and political domain.[73]

35.     When a State party invokes a legitimate ground for restriction of freedom of expression, it must demonstrate in specific and individualized fashion the precise nature of the threat, and the necessity and proportionality of the specific action taken, in particular by establishing a direct and immediate connection between the expression and the threat.[74]

36.     The Committee reserves to itself an assessment of whether, in a given situation, there may have been circumstances which made a restriction of freedom of expression

---

[67] See communication No. 518/1992, *Sohn v. Republic of Korea*, Views adopted on 18 March 1994.

[68] See communication No. 1157/2003, *Coleman v. Australia*.

[69] See communication No. 1373/2005, *Dissanayake v. Sri Lanka*.

[70] See communication No. 359, 385/89, *Ballantyne , Davidson and McIntyre v. Canada*.

[71] See communication No. 736/97, *Ross v. Canada*, Views adopted on 17 July 2006.

[72] General comment No. 27, para. 14. See also Communications No. 1128/2002, *Marques v. Angola*; No. 1157/2003, *Coleman v. Australia*.

[73] See communication No. 1180/2003, *Bodrozic v. Serbia and Montenegro*, Views adopted on 31 October 2005.

[74] See communication No. 926/2000, *Shin v. Republic of Korea* .

necessary.[75] In this regard, the Committee recalls that the scope of this freedom is not to be assessed by reference to a "margin of appreciation"[76] and in order for the Committee to carry out this function, a State party, in any given case, must demonstrate in specific fashion the precise nature of the threat to any of the enumerated grounds listed in paragraph 3 that has caused it to restrict freedom of expression.[77]

## Limitative scope of restrictions on freedom of expression in certain specific areas

37.     Among restrictions on political discourse that have given the Committee cause for concern are the prohibition of door-to-door canvassing,[78] restrictions on the number and type of written materials that may be distributed during election campaigns,[79] blocking access during election periods to sources, including local and international media, of political commentary,[80] and limiting access of opposition parties and politicians to media outlets.[81] Every restriction should be compatible with paragraph 3. However, it may be legitimate for a State party to restrict political polling imminently preceding an election in order to maintain the integrity of the electoral process.[82]

38.     As noted earlier in paragraphs  13 and 20, concerning the content of political discourse, the Committee has observed that in circumstances of public debate concerning public figures in the political domain and public institutions, the value placed by the Covenant upon uninhibited expression is particularly high.[83] Thus, the mere fact that forms of expression are considered to be insulting to a public figure is not sufficient to justify the imposition of penalties, albeit public figures may also benefit from the provisions of the Covenant.[84] Moreover, all public figures, including those exercising the highest political authority such as heads of state and government, are legitimately subject to criticism and political opposition.[85] Accordingly, the Committee expresses concern regarding laws on such matters as, lese majesty,[86] *desacato*,[87] disrespect for authority,[88] disrespect for flags and symbols, defamation of the head of state[89] and the protection of the honour of public officials,[90] and laws should not provide for more severe penalties solely on the basis of the

---

[75]  See communication No. 518/1992, *Sohn v. Republic of Korea* .
[76]  See communication No. 511/1992, *Ilmari Länsman, et al. v. Finland*, Views adopted on 14 October 1993.
[77]  See communications Nos. 518/92, *Sohn v. Republic of Korea*; No. 926/2000, *Shin v. Republic of Korea,*.
[78]  Concluding observations on Japan (CCPR/C/JPN/CO/5).
[79]  Ibid.
[80]  Concluding observations on Tunisia (CCPR/C/TUN/CO/5).
[81]  Concluding observations on Togo (CCPR/CO/76/TGO); concluding observations on Moldova (CCPR/CO/75/MDA).
[82]  See communication No. 968/2001, *Kim v. Republic of Korea*, Views adopted on 14 March 1996.
[83]  See communication No. 1180/2003, *Bodrozic v. Serbia and Montenegro*, Views adopted on 31 October 2005.
[84]  Ibid.
[85]  See communication No. 1128/2002, *Marques v. Angola.*
[86]  See communications Nos. 422-424/1990, *Aduayom et al. v. Togo*, Views adopted on 30 June 1994.
[87]  Concluding observations on the Dominican Republic (CCPR/CO/71/DOM).
[88]  Concluding observations on Honduras (CCPR/C/HND/CO/1).
[89]  See concluding observations on Zambia (CCPR/ZMB/CO/3), para.25.
[90]  See concluding observations on Costa Rica (CCPR/C/CRI/CO/5), para. 11.

identity of the person that may have been impugned. States parties should not prohibit criticism of institutions, such as the army or the administration.[91]

39.     States parties should ensure that legislative and administrative frameworks for the regulation of the mass media are consistent with the provisions of paragraph 3.[92] Regulatory systems should take into account the differences between the print and broadcast sectors and the internet, while also noting the manner in which various media converge. It is incompatible with article 19 to refuse to permit the publication of newspapers and other print media other than in the specific circumstances of the application of paragraph 3. Such circumstances may never include a ban on a particular publication unless specific content, that is not severable, can be legitimately prohibited under paragraph 3. States parties must avoid imposing onerous licensing conditions and fees on the broadcast media, including on community and commercial stations.[93] The criteria for the application of such conditions and licence fees should be reasonable and objective, [94] clear, [95] transparent, [96] non-discriminatory and otherwise in compliance with the Covenant.[97] Licensing regimes for broadcasting via media with limited capacity, such as audiovisual terrestrial and satellite services should provide for an equitable allocation of access and frequencies between public, commercial and community broadcasters. It is recommended that States parties that have not already done so should establish an independent and public broadcasting licensing authority, with the power to examine broadcasting applications and to grant licenses.[98]

40.     The Committee reiterates its observation in general comment No. 10 that "because of the development of modern mass media, effective measures are necessary to prevent such control of the media as would interfere with the right of everyone to freedom of expression". The State should not have monopoly control over the media and should promote plurality of the media.[99] Consequently, States parties should take appropriate action, consistent with the Covenant, to prevent undue media dominance or concentration by privately controlled media groups in monopolistic situations that may be harmful to a diversity of sources and views.

41.     Care must be taken to ensure that systems of government subsidy to media outlets and the placing of government advertisements[100] are not employed to the effect of impeding freedom of expression.[101] Furthermore, private media must not be put at a disadvantage compared to public media in such matters as access to means of dissemination/distribution and access to news.[102]

---

[91]  Ibid., and see concluding observations on Tunisia (CCPR/C/TUN/CO/5), para. 91..

[92]  See concluding observations on Viet Nam (CCPR/CO/75/VNM), para. 18, and concluding observations on Lesotho (CCPR/CO/79/Add.106), para. 23.

[93]  Concluding observations on Gambia (CCPR/CO/75/GMB).

[94]  See concluding observations on Lebanon (CCPR/CO/79/Add.78), para. 25.

[95]  Concluding observations on Kuwait (CCPR/CO/69/KWT); concluding observations on Ukraine (CCPR/CO/73/UKR).

[96]  Concluding observations on Kyrgyzstan (CCPR/CO/69/KGZ).

[97]  Concluding observations on Ukraine (CCPR/CO/73/UKR).

[98]  Concluding observations on Lebanon (CCPR/CO/79/Add.78).

[99]  See concluding observations on Guyana (CCPR/CO/79/Add.121), para. 19; concluding observations on the Russian Federation (CCPR/CO/79/RUS); concluding observations on Viet Nam (CCPR/CO/75/VNM); concluding observations on Italy (CCPR/C/79/Add. 37).

[100]  See concluding observations on Lesotho (CCPR/CO/79/Add.106), para. 22.

[101]  Concluding observations on Ukraine (CCPR/CO/73/UKR).

[102]  Concluding observations on Sri Lanka (CCPR/CO/79/LKA); and see concluding observations on Togo (CCPR/CO/76/TGO), para. 17.

42.     The penalization of a media outlet, publishers or journalist solely for being critical of the government or the political social system espoused by the government[103]can never be considered to be a necessary restriction of freedom of expression.

43.     Any restrictions on the operation of websites, blogs or any other internet-based, electronic or other such information dissemination system, including systems to support such communication, such as internet service providers or search engines, are only permissible to the extent that they are compatible with paragraph 3. Permissible restrictions generally should be content-specific; generic bans on the operation of certain sites and systems are not compatible with paragraph 3. It is also inconsistent with paragraph 3 to prohibit a site or an information dissemination system from publishing material solely on the basis that it may be critical of the government or the political social system espoused by the government.[104]

44.     Journalism is a function shared by a wide range of actors, including professional full-time reporters and analysts, as well as bloggers and others who engage in forms of self-publication in print, on the internet or elsewhere, and general State systems of registration or licensing of journalists are incompatible with paragraph 3. Limited accreditation schemes are permissible only where necessary to provide journalists with privileged access to certain places and/or events. Such schemes should be applied in a manner that is non-discriminatory and compatible with article 19 and other provisions of the Covenant, based on objective criteria and taking into account that journalism is a function shared by a wide range of actors.

45.     It is normally incompatible with paragraph 3 to restrict the freedom of journalists and others who seek to exercise their freedom of expression (such as persons who wish to travel to human rights-related meetings)[105] to travel outside the State party, to restrict the entry into the State party of foreign journalists to those from specified countries[106] or to restrict freedom of movement of journalists and human rights investigators within the State party (including to conflict-affected locations, the sites of natural disasters and locations where there are allegations of human rights abuses). States parties should recognize and respect that element of the right of freedom of expression that embraces the limited journalistic privilege not to disclose information sources.[107]

46.     States parties should ensure that counter-terrorism measures are compatible with paragraph 3. Such offences as "encouragement of terrorism"[108] and "extremist activity"[109] as well as offences of "praising", "glorifying", or "justifying" terrorism, should be clearly defined to ensure that they do not lead to unnecessary or disproportionate interference with freedom of expression. Excessive restrictions on access to information must also be avoided. The media plays a crucial role in informing the public about acts of terrorism and its capacity to operate should not be unduly restricted. In this regard, journalists should not be penalized for carrying out their legitimate activities.

---

[103]   Concluding observations on Peru (CCPR/CO/70/PER).

[104]   Concluding observations on the Syrian Arab Republic (CCPR/CO/84/SYR).

[105]   Concluding observations on Uzbekistan (CCPR/CO/83/UZB); concluding observations on Morocco (CCPR/CO/82/MAR).

[106]   Concluding observations on Democratic People's Republic of Korea (CCPR/CO/72/PRK).

[107]   Concluding observations on Kuwait (CCPR/CO/69/KWT).

[108]   Concluding observations on the United Kingdom of Great Britain and Northern Ireland (CCPR/C/GBR/CO/6).

[109]   Concluding observations on the Russian Federation (CCPR/CO/79/RUS).

47.     Defamation laws must be crafted with care to ensure that they comply with paragraph 3, and that they do not serve, in practice, to stifle freedom of expression.[110] All such laws, in particular penal defamation laws, should include such defences as the defence of truth and they should not be applied with regard to those forms of expression that are not, of their nature, subject to verification. At least with regard to comments about public figures, consideration should be given to avoiding penalizing or otherwise rendering unlawful untrue statements that have been published in error but without malice.[111] In any event, a public interest in the subject matter of the criticism should be recognized as a defence. Care should be taken by States parties to avoid excessively punitive measures and penalties. Where relevant, States parties should place reasonable limits on the requirement for a defendant to reimburse the expenses of the successful party.[112] States parties should consider the decriminalization of defamation[113] and, in any case, the application of the criminal law should only be countenanced in the most serious of cases and imprisonment is never an appropriate penalty. It is impermissible for a State party to indict a person for criminal defamation but then not to proceed to trial expeditiously – such a practice has a chilling effect that may unduly restrict the exercise of freedom of expression of the person concerned and others.[114]

48.     Prohibitions of displays of lack of respect for a religion or other belief system, including blasphemy laws, are incompatible with the Covenant, except in the specific circumstances envisaged in article 20, paragraph 2, of the Covenant. Such prohibitions must also comply with the strict requirements of article 19, paragraph 3, as well as such articles as 2, 5, 17, 18 and 26. Thus, for instance, it would be impermissible for any such laws to discriminate in favour of or against one or certain religions or belief systems, or their adherents over another, or religious believers over non-believers. Nor would it be permissible for such prohibitions to be used to prevent or punish criticism of religious leaders or commentary on religious doctrine and tenets of faith.[115]

49.     Laws that penalize the expression of opinions about historical facts are incompatible with the obligations that the Covenant imposes on States parties in relation to the respect for freedom of opinion and expression.[116] The Covenant does not permit general prohibition of expressions of an erroneous opinion or an incorrect interpretation of past events. Restrictions on the right of freedom of opinion should never be imposed and, with regard to freedom of expression, they should not go beyond what is permitted in paragraph 3 or required under article 20.

### The relationship between articles 19 and 20

50.     Articles 19 and 20 are compatible with and complement each other. The acts that are addressed in article 20 are all subject to restriction pursuant to article 19, paragraph 3. As

---

[110] Concluding observations on the United Kingdom of Great Britain and Northern Ireland (CCPR/C/GBR/CO/6).

[111] Ibid.

[112] Ibid.

[113] Concluding observations on Italy (CCPR/C/ITA/CO/5); concluding observations on the Former Yugoslav Republic of Macedonia (CCPR/C/MKD/CO/2).

[114] See communication No. 909/2000, *Kankanamge v. Sri Lanka*, Views adopted on 27 July 2004.

[115] Concluding observations on the United Kingdom of Great Britain and Northern Ireland-the Crown Dependencies of Jersey, Guernsey and the Isle of Man (CCPR/C/79/Add.119). See also concluding observations on Kuwait (CCPR/CO/69/KWT).

[116] So called "memory-laws", see communication No. , No. 550/93, *Faurisson v. France*. See also concluding observations on Hungary (CCPR/C/HUN/CO/5) paragraph 19.

such, a limitation that is justified on the basis of article 20 must also comply with article 19, paragraph 3.[117]

51.    What distinguishes the acts addressed in article 20 from other acts that may be subject to restriction under article 19, paragraph 3, is that for the acts addressed in article 20, the Covenant indicates the specific response required from the State: their prohibition by law. It is only to this extent that article 20 may be considered as *lex specialis* with regard to article 19.

52.    It is only with regard to the specific forms of expression indicated in article 20 that States parties are obliged to have legal prohibitions. In every case in which the State restricts freedom of expression it is necessary to justify the prohibitions and their provisions in strict conformity with article 19.

———————

[117] See communication No. 736/1997, *Ross v. Canada*, Views adopted on 18 October 2000.

# EXHIBIT 9

# Annotated Cambodian Code of Criminal Procedure

## Annotations to ECCC and Select International Jurisprudence



UNITED NATIONS
**HUMAN RIGHTS**
OFFICE OF THE HIGH COMMISSIONER
*Cambodia*



British Embassy
Phnom Penh



**USAID**
FROM THE AMERICAN PEOPLE



EAST · WEST
MANAGEMENT
INSTITUTE
Program on Rights and Justice (PRAJ)

# Article 133. Investigative Actions Requested by Charged Persons

*At any time during a judicial investigation, the charged person may ask the investigating judge to interrogate him, question a civil party or witness, conduct a confrontation or visit a site. The request shall be in writing with a statement of reasons.*

*If the investigating judge does not grant the request, he shall issue a rejection order within one month after receiving the request. This order shall state the reasons. The Prosecutor and the charged person shall be notified of the order without delay.*

*If the investigating judge has not decided within one month, the Royal Prosecutor can seize the Investigation Chamber who shall have the power to decide in the place of the investigating judge.*

### Application in the ECCC

**Request must be for action to collect information conducive to ascertaining the truth:** Request for investigative action by charged person must be request for action to be performed with purpose of collecting information conducive to ascertaining the truth.

> IENG SARY CASE: ADMISSIBILITY OF APPEAL REGARDING EVIDENCE OBTAINED THROUGH TORTURE, ECCC, PTC, 10 May 2010, paras. 22-23.

**Request must be clear, specific and relevant:** Request for investigative action must identify specifically investigative action requested and explain reasons why he/she considers said action necessary for conduct of investigation.

> IENG SARY CASE: EXCULPATORY EVIDENCE REQUEST APPEAL, ECCC, PTC, 12 Nov 2009, para. 43.

**Request must outline action and explain relevance; judges may decline if action similar to matter already investigated:** Request for investigative action must outline action to be taken in precise detail and thoroughly explain why requested action is relevant to ascertaining the truth (the *prima facie* relevance requirement). The *prima facie* relevance requirement has two sub requirements: (1) information

must fall within investigatory scope; and (2) there must be an obvious connection between action sought and matter under investigation, including crimes alleged. Degree of detail needed depends on particular facts of case, but must directly relate to charges at issue. Finally, judges may decline to act if they feel action requested is similar to matter already under investigation.

> NUON CHEA, IENG SARY AND KHIEU SAMPHAN CASES: EVIDENCE OF CHARGED PERSONS' CRIMINAL KNOWLEDGE APPEAL, ECCC, PTC, 27 Sept 2010, paras. 47-52 and 57.

**Investigating judge must dismiss requests for investigative action that they do not consider to be conducive to ascertaining the truth:** This is because of their duty not to continue investigation beyond certain length in order to avoid infringing fairness of the trial.

> NUON CHEA, IENG SARY AND IENG THIRITH CASE: ORDER ON INVESTIGATIVE REQUEST FOR EXCULPATORY EVIDENCE, ECCC, OCIJ, 19 Jun 2009, para. 10.

**Requests merely suggestions; review of refusal limited to whether discretion exercised sensibly and legally:** Requests do not compel investigation, and judges

have broad discretion to decide on usefulness and act upon such requests.

> IENG SARY CASE: EXCULPATORY EVIDENCE REQUEST APPEAL, ECCC, PTC, 12 Nov 2009, paras. 21 and 26.

**Procedural defects, corruption inadmissible:** Request for investigative action cannot be used to investigate interference with the administration of justice or corruption within court.

> IENG SARY CASE: NUON CHEA ELEVENTH INVESTIGATIVE REQUEST APPEAL, ECCC, PTC, 25 Aug 2009, paras. 25-26; NUON CHEA CASE: ELEVENTH INVESTIGATIVE REQUEST APPEAL, ECCC, PTC, 18 Aug 2009, para. 28.

**Only judges have power to undertake investigative action:** Parties are not permitted to engage in investigative acts, but may undertake preliminary inquiries necessary to determine whether to request an investigative action by the court, including review of potentially relevant public sources. However, parties are not allowed to inquire into non-public sources.

> NUON CHEA, IENG SARY, KHIEU SAMPHAN AND IENG THIRITH CASES: ADDITIONAL EVIDENTIARY MATERIAL REQUEST APPEAL, ECCC, PTC, 15 Jun 2010, paras. 10-12.

**Corresponding ECCC Internal Rule(s):** Internal Rules 55(10), 58, 66(1) and 66(3). Internal Rule 55(10) is substantially similar to Article 133 but does not impose a 15 day time limit on refusal orders and explicitly provides that it is subject to appeal. Internal Rule 66(1) entitles the charged person to request further investigative actions following notice of the termination of the investigation, while Internal Rule 66(3) allows an appeal against the closing of the investigation.

## Application of Comparable Articles in Other Jurisdictions

**UN Human Rights Committee**
*Cambodia is a party to the International Covenant on Civil and Political Rights (ICCPR), which sets out international law principles on criminal procedure. Below are examples of how comparable ICCPR articles have been interpreted and applied by its implementing body, the UN Human Rights Committee.*

**Violation: denying charged person relevant witnesses:** Although right to present evidence on one's behalf does not imply charged person has an *unlimited* right to examine witnesses on his/her behalf, denying charged person the right to have witnesses admitted that are relevant to the defense is a violation.

> KHUSEYNOVA & BUTAEVA V. TAJIKISTAN, UN HRC, 20 Oct 2008, para. 8.5.

**May not deprive charged person of right to present, examine evidence:** Although State may establish rules of evidence in its legislation, domestic rules may not deprive a charged person of the right to compel the attendance of witnesses and cross-examine witnesses as is available to the prosecution.

> IDIEVA V. TAJIKISTAN, UN HRC, 31 Mar 2009, para. 9.6.

**Comparable Article(s) in the *International Covenant on Civil and Political Rights*:** Article 14(3)(e). This article protects the charged person's right to examine the witnesses against him/her and to examine witnesses on his/her behalf.

**European Court of Human Rights**
*The European Convention for the Protection of Human Rights and Fundamental Freedoms contains substantially similar criminal procedure protections to the International Covenant on Civil and Political Rights, to which Cambodia is a party. Below are examples of how comparable European Convention articles have been interpreted and applied by its court, the European Court of Human Rights.*

**Charged person has right to call, examine or have examined witnesses under same conditions as prosecution:** This rule applies also during investigation proceedings.

BONISCH v AUSTRIA, ECHR, 6 May 1985, para. 33.

**Comparable Article(s) in the European *Convention for the Protection of Human Rights and Fundamental Freedoms*:** Article 6(3). This article provides for fair trial rights including the rights of a charged person during the trial, including, in particular, the right to call, examine or have examined witnesses on his/her behalf under the same conditions as those against him/her.

---

*French Court of Cassation*
*The Cambodian Code of Criminal Procedure was based on the French Code of Criminal Procedure. Below are examples of how comparable French code articles have been interpreted and applied in the highest court in France, the Court of Cassation.*

---

**Parties cannot request witnesses to produce documents:** They can only request documents from other parties to the case.

No. 96-83118, CRIM. BULL. 118, FCC, 25 Mar 1997.

**Investigating judge has discretion to refuse party's application:** Court of Cassation cannot control this.

No. 96-83118, CRIM. BULL. 118, FCC, 25 Mar 1997.

**Parties' lawyers may attend examination of expert by investigating judge following prosecutors' submissions:** This results from the principle of equality of arms.

No. 10-81313, CRIM. BULL. 78, FCC, 11 May 2010.

**Comparable Article(s) in the French *Code of Criminal Procedure*:** Article 82-1. This article grants parties the right to request investigative actions by the investigating judge and empowers the investigating judge to undertake those acts or refuse them by way of a reasoned decision.

# EXHIBIT 10

THE CODE OF CIVIL PROCEDURE OF CAMBODIA

Table of Contents

**BOOK ONE GENERAL PROVISIONS** ...................................................................... 4

CHAPTER ONE      TENOR OF CODE, PURPOSE OF CIVIL ACTIONS,
OBLIGATIONS OF COURT AND PARTIES ................................................................ 4

CHAPTER TWO      COURT ........................................................................................ 4

Section I.      Jurisdiction ........................................................................................ 4

Section II.      Structure of Courts ............................................................................ 8

Section III.      Distribution of Cases and Exclusion and Challenge of Judges, etc. ... 8

CHAPTER THREE      PARTIES ................................................................................ 10

Section I.      Capacity to be Party and Capacity to Litigate .................................. 10

Section II.      Joint Litigation .............................................................................. 11

Section III.      Intervention/Participation ............................................................. 12

Section IV.      Appointed Representatives and Assistants....................................... 14

CHAPTER FOUR      LITIGATION COSTS ............................................................. 16

Section I.      Definitions and Types of Litigation Costs ........................................ 16

Section II.      Imposition of Litigation Costs ........................................................ 18

Section III.      Security for Litigation Costs ........................................................... 19

Section IV.      *In Forma Pauperis* (Aid in litigation)............................................ 20

CHAPTER FIVE      SECURITY UNDER LITIGATION .......................................... 21

**BOOK TWO PROCEEDINGS AT THE COURT OF FIRST INSTANCE** ............ 22

CHAPTER ONE      SUIT........................................................................................... 22

CHAPTER TWO      ORAL ARGUMENT AND PREPARATION THEREFOR ........ 24

Section I.      General Rules................................................................................... 24

Section II.      Preparatory Documents................................................................... 26

Section III.      Preparatory Proceedings for Oral Arguments ................................... 26

Section IV.      Oral Argument................................................................................ 28

CHAPTER THREE      EVIDENCE............................................................................ 30

Section I.      General Rules................................................................................... 30

Section II.      Examination of Witnesses................................................................ 32

Section III.      Examination of Parties.................................................................... 34

Section IV.      Expert Testimony ........................................................................... 35

Section V.      Documentary Evidence ................................................................... 37

Section VI.   Inspection ........................................................................ 40

Section VII.   Preservation of Evidence .................................................. 40

CHAPTER FOUR   INTERRUPTION AND SUSPENSION OF LITIGATION ........ 42

CHAPTER FIVE   JUDGMENT .......................................................... 43

Section I.   General Provisions Regarding Decisions.......................... 44

Section II.   General Provisions Regarding Judgment.......................... 44

Section III.   Transmittal of Judgment .................................................. 45

Section IV.   Effectiveness of Judgment ................................................ 46

Section V.   Default Judgment .............................................................. 48

Section VI.   Rulings ............................................................................ 50

CHAPTER SIX   CONCLUSION OF ACTION NOT BASED ON JUDGMENT . 51

CHAPTER SEVEN   SPECIAL PROVISIONS REGARDING SMALL CLAIM

MATTERS   ...................................................................... 52

CHAPTER EIGHT   DATES, TERM, SERVICE .................................................. 55

Section I.   Dates, Terms.................................................................... 55

Section II.   Service............................................................................. 56

CHAPTER NINE   VIEWING OF CASE RECORDS ............................................ 59

**BOOK THREE APPEAL** ............................................................................ **61**

CHAPTER ONE   GENERAL RULES.................................................... 61

CHAPTER TWO   *UTTOR* APPEAL ........................................................ 61

CHAPTER THREE   *SATUK* APPEAL ......................................................... 65

CHAPTER FOUR   *CHOMTOAH* APPEAL.................................................. 68

**BOOK FOUR RETRIAL** ........................................................................... **70**

CHAPTER ONE   RETRIAL.............................................................. 70

**BOOK FIVE DEMAND PROCEDURE**................................................... **73**

CHAPTER ONE   DEMAND PROCEDURE ........................................ 73

**BOOK SIX COMPULSORY EXECUTION** .............................................. **77**

CHAPTER ONE   GENERAL PROVISIONS........................................... 77

Section I.   Tenor ............................................................................. 77

Section II.   Execution Organs............................................................ 77

Section III.   Execution Parties and Representatives ............................ 79

Section IV.   Necessary Conditions to Execution ................................. 79

Section V.   Suits Relating to Execution.............................................. 85

Section VI.    Stay and Cancellation of Execution ................................................. 86

Section VII.   Execution Costs and Inspection of Execution Record ..................... 88

CHAPTER TWO        EXECUTION OF CLAIMS HAVING THE OBJECT OF MONETARY

PAYMENT         ................................................................................................. 89

Section I.     Attachable Property ........................................................................... 90

Section II.    Execution Against Movables ............................................................. 92

Section III.   Execution Against Claims and Other Property Rights ...................... 96

Section IV.    Execution against Immovables ........................................................ 101

Section V.     Execution against Vessels ................................................................ 112

Section VI.    Procedures for Distribution by Court ............................................... 119

CHAPTER THREE       SPECIFIC RULES GOVERNING ENFORCEMENT OF

SECURITY INTERESTS ............................................................................................ 123

Section I.     General Provisions ........................................................................... 123

Section II.    Enforcement of Security Interests against Movables ..................... 125

Section III.   Enforcement of Security Interests against Claims and Other Property

               ........................................................................................................ 126

Section IV.    Enforcement of Security Interests against Immovables ................. 127

Section V.     Enforcement of Security Interests against Vessels ........................ 132

CHAPTER FOUR        EXECUTION OF CLAIM RIGHTS OF WHICH THE SUBJECT

MATTER IS NOT MONEY ....................................................................................... 133

**BOOK SEVEN PRESERVATIVE RELIEF ............................................................. 137**

CHAPTER ONE        GENERAL PROVISIONS ....................................................... 137

CHAPTER TWO        RULING OF PRESERVATIVE RELIEF ................................. 139

Section I.     General Provisions ........................................................................... 139

Section II.    Ruling of Provisional Attachment .................................................... 140

Section III.   Ruling of Provisional Disposition .................................................... 140

Section IV.    Objection to Preservative Relief ...................................................... 141

Section V.     Cancellation of Ruling of Preservative Relief ................................ 142

Section VI.    Chomtoah Appeals .......................................................................... 143

CHAPTER THREE       EXECUTION OF PRESERVATIVE RELIEF ......................... 144

**BOOK EIGHT TRANSITIONAL PROVISIONS .................................................... 147**

CHAPTER ONE        TRANSITIONAL PROVISIONS ............................................. 147

**BOOK NINE FINAL PROVISIONS ....................................................................... 151**

CHAPTER ONE        FINAL PROVISIONS ............................................................. 151

Code (Examination of witnesses) shall apply *mutatis mutandis* to the examination of an expert witness, except that the provisions of Article 132 (Duty to serve as witness), Paragraph 2 shall not apply.

### Section V.   Documentary Evidence

**148.   (Offer of documentary evidence, etc.)**
1.   Documentary evidence shall be offered through the presentation of a document in the possession of a party or through a motion for an order requiring the holder of a document to produce the document.
2.   Notwithstanding the provisions of Paragraph 1, documentary evidence may be offered through a motion filed with the court demanding that the court request the holder of a document to send the document to the court.
3.   The court may, where the court deems it necessary, keep custody of any document that is presented or sent to the court.

**149.   (Attachment of translation, etc.)**
1.   When documentary evidence is offered through the presentation of a document written in a foreign language, a translation of the parts of the document with respect to which evidence is being offered shall be attached.
2.   Where the adversary party has opinions regarding the accuracy of the translation referred to in Paragraph 1, such opinions shall be submitted in writing to the court.

**150.   (Duty to produce document)**
1.   Except as otherwise provided in this Code or other laws, production of a document may not be refused by the holder thereof.
2.   The holder of a document may refuse the production thereof if the document falls under any of the following categories:
    (a)   a document that contains matters that would give rise to the possibility that the holder of the documents or the spouse or other relative thereof could be prosecuted for or found guilty of a crime, or that would bring humiliation or disgrace on such person or cause significant harm to his/her domestic relationships;
    (b)   a document that involves the official secrets of a public official, where production of such document would significantly hinder the exercise of public duties; or
    (c)   a document involving facts learned by a current or former doctor, dentist, midwife, nurse, pharmacist, attorney or clergyman in the course of his/her professional duties, or technological or business secrets, and the holder of the facts or secrets has not been released or exempted from the duty to maintain confidentiality.

**151.   (Motion for order to produce documents)**
1.   A motion for an order to produce documents must specify the following matters in detail:
    (a)   the title of the document, and a basic description of its contents;
    (b)   the holder of the document; and

(c)   the facts to be proven thereby.

2.    A motion for an order to produce documents must be made in writing.

3.    Where the adversary party has opinions regarding the motion described in Paragraph 2, such opinions shall be submitted in writing to the court.

**152.  (Order to produce documents, etc.)**

1.    Where the court determines that sufficient grounds for an order to produce documents exist, the court shall issue a ruling ordering the holder of the documents to produce such documents. In this case, where the documents contain parts that are deemed outside the scope of inquiry, or as to which no duty to produce is deemed to exist, the court may order that such parts be omitted from the documents produced.

2.    Where the court intends to order a third party to produce documents, the court shall examine of the third party.

3.    A *Chomtoah* appeal may be made against a ruling on a motion to produce documents.

**153.  (Effect of party's failure to comply with order to produce documents, etc.)**

1.    When a party fails to comply with an order to produce documents, the court may deem the other party's allegations regarding the contents of such documents to be true.

2.    The rule set forth in Paragraph 1 shall also apply to cases where, in order to prevent its use by the other party, a party causes a document that the party was required to produce to be lost, or otherwise makes it impossible for the other party to use the document.

3.    In the cases described in Paragraphs 1 and 2, where the other party has substantial difficulty in making specific allegations regarding the contents of a document and in proving by other means a fact that was to be proven by such document, the court may deem the other party's allegations regarding such fact to be true.

**154.  (Civil fine for failure of third party to comply with order to produce documents)**

1.    Where a third party fails to comply with an order to produce documents, the court may issue a ruling imposing on the third party a civil fine of not more than 2,000,000 riels.

2.    A *Chomtoah* appeal may be made against a ruling issued pursuant to Paragraph 1.

**155.  (Execution of document)**

1.    A party offering documentary evidence shall prove that the document was authentically executed.

2.    A document that is determined, based on its form and content, to be created by a public official in the course of official business, shall be presumed to be an authentically executed official document.

3.    Where doubt exists regarding the authenticity of an official document's execution, the court may, on its own authority, inquire of the relevant government agency or official.

4.    Unofficial documents signed by the principal or the principal's representative shall

be presumed to have been authentically executed.

5.   The provisions of Paragraphs 2 and 3 shall apply *mutatis mutandis* to documents deemed to have been created by a foreign government agency or official.

**156.  (Proof by handwriting comparison, etc.)**

1.   The authenticity of a document's execution may be proven through handwriting comparison.

2.   The provisions of Article 148 (Offer of documentary evidence, etc.), Article 152 (Order to produce documents, etc.) and Paragraphs 1 and 2 of Article 153 (Effect of party's failure to comply with order to produce documents, etc.) shall apply *mutatis mutandis* to the production or sending of documents and other items necessary in order to perform handwriting comparison.

3.   If there is no suitable sample of the adversary party's handwriting for purposes of comparison, the court may order the adversary party to write text to be used for purposes of comparison.

4.   If a party fails without reasonable cause to comply with a ruling issued pursuant to Paragraph 3, the court may deem to be true the allegations of the person offering the document in evidence as to the authenticity of the document's execution. This shall also apply where the writing has been altered or disguised.

5.   If without reasonable cause a third party fails to comply with an order to produce documents issued pursuant to the provisions of Paragraph 1 of Article 153 (Effect of party's failure to comply with order to produce documents, etc.), which apply *mutatis mutandis* under Paragraph 2, the court may issue a ruling imposing on the third party a civil fine of not more than 2,000,000 riels.

6.   A *Chomtoah* appeal may be made against a ruling made pursuant to Paragraph 5.

**157.  (Civil fine against person disputing authenticity of execution of document)**

1.   Where a party or the party's representative intentionally or through gross negligence falsely disputes the authenticity of a document's execution, the court may issue a ruling imposing a civil fine of not more than 1,000,000 riels against the party or representative.

2.   A *Chomtoah* appeal may be made against a ruling made pursuant to Paragraph 1.

3.   In cases referred to in Paragraph 1, where the party or representative that disputed the authenticity of execution of a document thereafter recognizes the document's authenticity while the suit is still pending, the court may, depending on the circumstances, rescind its ruling referred to in that Paragraph.

**158.  (Application of articles corresponding to documents)**

The provisions of this Section shall apply *mutatis mutandis* to articles such as drawings, photographs, audio and video tapes, and other items that are not documents but were created in order to express information.

**159.  (Offer of documentary evidence comprising transcription of audio tapes, etc.)**

A party that offers documentary evidence comprising a transcription of an audio tape, video tape or other article on which certain matters can be recorded using corresponding methods shall, in cases where the other party has requested delivery of a copy of such article, deliver a copy thereof to the other party.

**160. (Submission of document explaining contents of recording tape, etc.)**

1.  A party offering examination of evidence on an audio tape or any other article described in Article 159 (Offer of documentary evidence comprising transcription of audio tapes, etc.) shall, when so requested by the court or the other party, submit a written transcription of those recorded in the article or a document that explains the contents thereof.

2.  Where the adversary party has opinions regarding the contents of the explanation provided for in the document mentioned in Paragraph 1, such opinions shall be submitted in writing to the court.

**Section VI.   Inspection**

**161. (Offer of inspection)**

An offer of inspection shall indicate the object to be inspected.

**162. (Production of object to be inspected, etc.)**

1.  The provisions of Articles 148 (Offer of documentary evidence, etc.), 152 (Order to produce documents, etc.) and 153 (Effect of party's failure to comply with order to produce documents, etc.) shall apply *mutatis mutandis* to the production or sending of the object to be inspected.

2.  If a third party fails without reasonable cause to comply with an order of production made pursuant to Paragraph 1 of Article 152 (Order to produce documents, etc.), which applies *mutatis mutandis* under Paragraph 1, the court may issue a ruling imposing a civil fine on the third party of not more than 2,000,000 riels.

3.  A *Chomtoah* appeal may be made against a ruling made pursuant to Paragraph 2.

**Section VII.   Preservation of Evidence**

**163. (Preservation of evidence)**

1.  Where the court determines that circumstances exist that make it difficult to use evidence unless the evidence is examined beforehand, the court may, upon motion or application, examine the evidence in accordance with the provisions of this Section.

2.  The results of an examination of evidence made pursuant to Paragraph 1 shall have effect in an action for adjudication of the merits of a case.

3.  The parties shall state, at the oral argument of the action for adjudication of the merits of a case, the results of the examination of evidence that took place pursuant to Paragraph 1.

**164. (Court having jurisdiction)**

1.  A motion for preservation of evidence after suit has been filed shall be made to the court before which the evidence is to be used.

2.  An application for preservation of evidence before suit has been filed shall be made to the court of first instance having jurisdiction over either: (i) the residence of the person to be examined or the holder of the documents to be examined; or