# EXHIBIT 18

The New York Times | https://nyti.ms/2Fz2kbh

TECHNOLOGY

# In Some Countries, Facebook's Fiddling Has Magnified Fake News

## Leer en español

By SHEERA FRENKEL, NICHOLAS CASEY and PAUL MOZUR   JAN. 14, 2018

SAN FRANCISCO — One morning in October, the editors of Página Siete, Bolivia's third-largest news site, noticed that traffic to their outlet coming from Facebook was plummeting.

The publication had recently been hit by cyberattacks, and editors feared it was being targeted by hackers loyal to the government of President Evo Morales.

But it wasn't the government's fault. It was Facebook's. The Silicon Valley company was testing a new version of its hugely popular News Feed, peeling off professional news sites from what people normally see and relegating them to a new section of Facebook called Explore. Like it or not, Bolivia had become a guinea pig in the company's continual quest to reinvent itself.

As Facebook updates and tweaks its service in order to keep users glued to their screens, countries like Bolivia are ideal testing grounds thanks to their growing, internet-savvy populations. But these changes can have significant consequences, like limiting the audience for nongovernmental news sources and — surprisingly — amplifying the impact of fabricated and sensational stories.

On Thursday, Facebook announced plans to make similar changes to its News Feed around the world. The company said it was trying to increase "meaningful interaction" on its site by drawing attention to content from family and friends while de-emphasizing content from brands and publishers, including The New York Times.

The changes are being made as the company finds itself embroiled in a larger debate over its role in spreading fake news and misinformation aimed at influencing elections in the United States and other nations.

Facebook said these News Feed modifications were not identical to those introduced last fall in six countries through its Explore program, but both alterations favor posts from friends and family over professional news sites. And what happened in those countries illustrates the unintended consequences of such a change in an online service that now has a global reach of more than two billion people every month.

In Slovakia, where right-wing nationalists took nearly 10 percent of Parliament in 2016, publishers said the changes had actually helped promote fake news. With official news organizations forced to spend money to place themselves in the News Feed, it is now up to users to share information.

"People usually don't share boring news with boring facts," said Filip Struharik, the social media editor of Denník N, a Slovakian subscription news site that saw a 30 percent drop in Facebook engagement after the changes. Mr. Struharik, who has been cataloging the effects of Facebook Explore through a monthly tally, has noted a steady rise in engagement on sites that publish fake or sensationalist news.

A bogus news story that spread in December illustrates the problem, Mr. Struharik said. The story claimed that a Muslim man had thanked a good Samaritan for returning his lost wallet, and had warned the Samaritan of a terrorist attack that was planned at a Christmas market.

The fabricated story circulated so widely that the local police issued a statement saying it wasn't true. But when the police went to issue the warning on Facebook, they found that the message — unlike the fake news story they meant to combat — could no longer appear on News Feed because it came from an official account.

Facebook explained its goals for the Explore program in Slovakia, Sri Lanka, Cambodia, Bolivia, Guatemala and Serbia in a blog post in October. "The goal of this test is to understand if people prefer to have separate places for personal and public

content," wrote Adam Mosseri, head of Facebook's News Feed. "There is no current plan to roll this out beyond these test countries."

The company did not respond to a list of questions about the Explore program, but Mr. Mosseri said in a statement on Friday that the company took its role as a "global platform for information" seriously.

"We have a responsibility to the people who read, watch and share news on Facebook, and every test is done with that responsibility in mind," he said.

The impact of the changes to the News Feed were also felt in Cambodia. Months into the experiment (Facebook hasn't said when it will end), Cambodians still don't know where to find trusted, established news on Facebook, said Stuart White, editor of The Phnom Penh Post, an English-language newspaper.

Nongovernmental organizations working on issues like education and health care also complained that the changes broke down lines of communication to Cambodians in need.

Facebook has become particularly important in Cambodia. The country's leader, Hun Sen, has cracked down on political opponents, activists and media, effectively transforming the struggling democracy into a one-party state. Journalists have been arrested, newspapers have been shut down, and Facebook has emerged as an important, more independent channel for information.

That is, if you can find that information. Mr. White recalled a conversation this month with a friend who casually observed the lack of political conversation on Facebook.

"He said he thought the government had banned politics on Facebook," Mr. White said. "He had no idea that Facebook had created Explore or was placing news there. He's a young, urbanite, English-speaking Cambodian. If he didn't know about it, what do you think the effects are on other parts of the country?"

In Bolivia, the alterations to the News Feed also occurred in a country where the government and the press have found themselves at odds, with news sites like

Página Siete frequently criticizing Mr. Morales, a left-wing populist who has accumulated enormous power since being elected president in 2006.

"We became the only media to take on the government," said Rodolfo Huallpa, the web editor of Página Siete. Half of the site's traffic came from social media, with the lion's share of that from Facebook, he said. Since Explore was introduced, overall web traffic to the site has dropped 20 percent.

The loss of visitors from Facebook was readily apparent in October, and Mr. Huallpa could communicate with Facebook only through a customer service form letter. He received an automatic reply in return.

After complaints from other outlets, Facebook eventually released a statement on a blog in Spanish explaining the Explore feature and the testing being done in Bolivia and other countries. But Facebook offered no means to contact it, Mr. Huallpa said.

"We can't talk to Zuckerberg, we can't even talk to a customer service representative," said Isabel Mercado, the editor of Página Siete, referring to Facebook's chief executive, Mark Zuckerberg.

The Explore experiment has reduced traffic by 30 to 60 percent at the website of Los Tiempos, the main newspaper of Cochabamba, the country's fourth-largest city, said Fabiola Chambi, the publication's web editor.

Ms. Chambi, however, fears the main consequence of the Explore function will be deepening polarization in a country already divided by ideology. "It's good to see things from your friends and your family, but there needs to be diversity of information," she said. "The miscellany is good."

Bolivia has also seen an increase in fake news as the established news sites are tucked behind the Explore function.

During nationwide judicial elections in December, one post widely shared on Facebook claimed to be from an election official saying votes would be valid only if an X was marked next to the candidate's name. Another post that day said government officials had put pens with erasable ink in the voting booths.

Vladimir Tirado, a social media expert in Bolivia, said the government might simply begin paying for posts to appear on users' News Feeds, an option that he said most newsrooms could not afford.

"Whoever has more money will appear more," Mr. Tirado said. "In this sense, the government will certainly win."

Ms. Chambi of Los Tiempos said her newsroom hardly had enough money to pay its journalists to report stories, let alone to distribute them as paid posts on Facebook. The situation has left her uneasy about the role that the tech giant may play in her country.

"It's a private company — they have the right to do as they please, of course," she said. "But the first question we asked is 'Why Bolivia?' And we don't even have the possibility of asking why. Why us?"

Sheera Frenkel reported from San Francisco; Nicholas Casey from La Paz, Bolivia; and Paul Mozur from Shanghai. Monica Machicao contributed reporting from La Paz.

A version of this article appears in print on January 14, 2018, on Page A1 of the New York edition with the headline: Test Countries For Facebook Illustrate Risk.

© 2018 The New York Times Company

# EXHIBIT 19

# Could Facebook Be Tried for Human-Rights Abuses?

### The legal path is murky.



Ralph Orlowski / Reuters

**INGRID BURRINGTON**

**DEC 20, 2017** | **TECHNOLOGY**

---

Like *The Atlantic*? Subscribe to The Atlantic Daily, our free weekday email newsletter.

| Email | | SIGN UP |

---

It's almost quaint to think that just five years ago, Mark Zuckerberg cheerfully took credit for major pro-democracy movements during Facebook's IPO launch. Contradicting his previous dismissal of the connection between social media and the Arab Spring, Zuckerberg's letter to investors spoke not just about the platform's business potential but also its capacity to increase "direct empowerment of people, more accountability for officials, and better solutions to some of the biggest problems of our time." 2012 Facebook promised a rise of new leaders "who are pro-internet and fight for the rights of their people, including the right to share

what they want and the right to access all information that people want to share with them." Technically, that promise came true, though probably not how Zuckerberg imagined.

Today, the company has to reckon with its role in passively enabling human-rights abuses. While concerns about propaganda and misinformation on the platform reached a fever pitch in places like the United States in the past year, its presence in Myanmar has become the subject of global attention. During the past few months, the company was accused of censoring activists and journalists documenting incidents of and posting about what the State Department has called ethnic cleansing of the country's Rohingya minority. Because misinformation and propaganda against the Rohingya apparently avoided the community-standards scrutiny afforded activist speech, and because of the News Feed's tendency to promote already-popular content, posts with misinformation aiming to incite violence have easily gone viral. Experts describe Facebook's role in the country as the de facto internet, which gives all of their actions and inactions on content even greater influence on politics and public knowledge.

Platform entanglement in human-rights abuses isn't unique to Facebook. Earlier this year, YouTube deployed a content-moderation algorithm intended to remove terrorist content, inadvertently deleting archives of footage that Syrian activists had been collecting as war-crimes evidence. Some have made similar criticisms of American platforms operating abroad, including Twitter's compliance with Turkish government requests for censorship, and similar acts by platforms in China.

The 2016 election has given platform regulation new traction in American policy circles, bringing debate in the United States closer to Europe's. But beyond Western electoral politics, there remain hard legal questions with far more human lives at stake. While the violence in Myanmar predates Facebook's presence in the country and absolutely can't be fully laid at their feet, the platform is a central source of online information, and in Myanmar propaganda legitimizing crimes against humanity can have massive reach and influence. Dissident voices posting poems about the crisis have been declared in violation of vaguely defined community

standards (and, while those decisions have sometimes been reversed, it's usually after receiving media attention, which not all incidents are likely to receive). There's been coverage and documentation of hate speech on the platform in Myanmar since 2014, which is to say Facebook has been aware of the issue for quite some time.

When asked about what resources the company has allocated to address misinformation and hate speech, Facebook spokesperson Ruchika Budhraja responded via email that "we have steadily increased our investment over the years in the resources and teams that assist in ensuring our services are used by people in Myanmar to connect in a meaningful and safe way." Projects like illustrated print copies of their community standards translated into Burmese comics in 2015, partnerships with civil-society groups, and a Facebook safety page for Myanmar with PDFs of the illustrated community standards and safety guide are among the digital-literacy campaigns that, Budhraja wrote, "have reached millions of people, and we listen to local community groups so that we can continue to refine the way in which we implement and promote awareness of our policies to help keep our community safe."

This is encouraging, though Facebook still has no full-time staff on the ground in Myanmar. Regardless of past and ongoing good-faith efforts from Facebook to try to address what's happening now, the damage has been and continues to be done.

While advocates and journalists made compelling moral and ethical arguments for Facebook to take action this past fall, legal liability remained conspicuously absent. There's no agreed-upon point at which a platform's automated actions at scale rise to a potentially illegal level of complicity in crimes against humanity, and seemingly little agreement about what is to be done after that point is reached.

That's partly because it's extremely unlikely that Facebook (or the other big platforms) will ever be deemed legally liable or legally compelled to accountability for playing a significant role in human-rights abuses around the world. Even posing the question of a platform's legal culpability for human-rights abuses seems a quixotic pursuit, based on the reaction when I've brought it up with attorneys and

human-rights advocates. The apparent absurdity of pursuing legal accountability seems to have less to do with the innocence or guilt of platforms and more to do with the realities of human-rights law, which has a poor track record with regard to corporations in general and which is uniquely challenged and complicated by tech platforms in particular.

To assume one might hold a company legally responsible for human-rights abuses also assumes there's a jurisdiction that can hear the case. The International Criminal Court isn't really set up to try companies—and, even if it were, it can only bring cases against nations whose governments are signatories to the Rome Statute (the treaty that established the ICC). The United States signed but never ratified the treaty and formally withdrew its signature in 2002. The ICC technically can bring cases on behalf of member countries (as ICC prosecutor Fatou Bensouda argued this year when requesting to investigate the United States on behalf of member state Afghanistan), but Myanmar isn't a member.

Filing a case in the country where human-rights abuses take place is difficult, because an oppressive regime's court system is unlikely to actually offer a fair trial to victims. In the United States, noncitizens can file civil suits against American companies that have violated international treaties under the somewhat obscure 1789 Alien Tort Statute. But case law isn't exactly in the victim's favor with the statute. Companies tend to have more success, particularly in light of 2013's Supreme Court case Kiobel vs. Royal Dutch Petroleum, which ruled that the statute technically doesn't apply to actions taken outside the United States (though, seeing as Facebook has no full-time employees in Myanmar and the News Feed is worked on by engineers in the United States, there might still be an argument here). Given the overhead and exhaustion of legal battles with well-lawyered companies, and given companies' preference to make bad PR quietly disappear, at best victims might settle out of court.

Assuming one settles the thorny jurisdiction question, it's difficult to identify what crime Facebook has committed. Lack of foresight isn't actually a crime against humanity. Furthermore, "the persecution and discrimination against the Rohingya

has been going on for quite some time, and it would be happening if Facebook was not there at all," pointed out Cynthia Wong, a senior researcher on internet and human rights at Human Rights Watch.

Then again, Wong noted, "I do think in general Facebook has not fully grappled with the harms that its platform can contribute to" when it serves as a population's de facto internet and, therefore, central source for information. Acting as foundational communications infrastructure, of course, doesn't make the company responsible for the content on the site, hateful as it may be. The operator of German printing presses wasn't sentenced to execution at Nuremberg, the editor of *Der Stuermer* was, and Section 230 of the Communications Decency Act protects platforms from liability for content posted by users on the platform.

But comparisons of Facebook to the printing press start to seem flimsy when considering the power and influence of the News Feed. "When they start taking that step of targeting information, I think there's an argument to potentially be made that they're no longer just like any other publishing outlet but that they're actually actively participating in who sees what and with what degree of impact," said Alexa Koenig, the director of UC Berkeley's Human Rights Center.

Facebook doesn't make the content and isn't liable for it beyond its own community standards, but it does make, manage, and moderate the systems that move certain content to the top of a user's News Feed, in the service of keeping more users engaged with content on the platform and thus placing more eyeballs on ads. Algorithmic content curation and targeting, this argument goes, is still an act of curation and targeting. In this case, Facebook's curation (or lack thereof) gave a greater platform and credibility to misinformation and propaganda advocating ethnic cleansing. In the case of graphic content documenting atrocities against Rohingya that were taken down by moderators, the decisions about what not to publish and interpretation of takedown policies are also decisions that go beyond passively posting content.

But is reverse-chron sorting or content moderation a particular right? Probably not. "You could say that they're violating the right to truth or information, but those

rights are really limited in scope," explained Steven Ratner, a law professor at the University of Michigan. "There is no explicit right to accurate news in any [international human-rights] treaties."

One term frequently invoked when platforms passively facilitate abuse or violence is Dictionary.com's word of the year, "complicit"—which can be invoked in law, but not with the gossamer flourish of moral appeal. "Complicity" as a legal concept in international law tends to be used to hold accountable bureaucrats or underlings who were "just following orders" in a genocidal regime, and far harder to apply to companies. It requires proof that the accused knowingly aided and abetted (usually state, but possibly non-state) abuses, and in so doing either actively sought the abusive outcome or materially benefited from it.

This is part of the argument in recent lawsuits against platforms from victims of terrorist attacks and surviving families, which argue that platforms aren't liable for the existence of terrorist content on their platforms, but that they are liable for profiting from their promotion of that content on their platform. Protections against content liability, the argument goes, don't apply to automated advertisements.

Material gain from rights abuses was also at stake in Xiaoning et al. vs. Yahoo, the lawsuit filed in 2007 following Yahoo's cooperation with the Chinese government's requests for user data that led to the imprisonment and abuse of two dissidents. In that case, the evidence of intent and benefit were much more cut-and-dried than trying to argue the subtleties of what is and isn't covered by Section 230. The case resulted in a settlement and the creation of a fund to support Chinese activists that recently became subject to a new lawsuit.

Even hard proof of complicity and material gain doesn't always translate into a successful suit depending on the time lapsed since the abuses and the jurisdiction of the lawsuit. To this day, IBM has never been successfully sued for its role in the Holocaust, partly due to jurisdictional disputes and statutes of limitations. During World War II, several of IBM's European subsidiaries supplied the Nazi regime with punch-card technology that was used to facilitate the Final Solution in all its bureaucratic horror, from tracking the trains used to transport Jews to

concentration camps to providing the rudimentary foundation for the infamous numbered tattoos at Auschwitz. (IBM has never disavowed these facts; it only disputes the claim that their New York headquarters had full knowledge of their subsidiaries' actions.)

There are other legal concepts that might better capture Facebook's impact and potential liability. Koenig brought up possibilities in American civil tort law. "I could see lawyers arguing that there's been negligence due to these companies creating new vulnerabilities that give rise to a heightened duty of care." Duty of care is a concept more pedantic than its poetic phrasing suggests—it's a term for a person or company's legal obligation to reasonably act to prevent foreseeable harms. In addition to negligence, Koenig noted that "perhaps most interesting is the possible application of a recklessness standard—that the companies knew or should have known that they were creating dependencies that led to new vulnerabilities that allowed criminal activities and other harms to occur." The legal questions here would include whether or how Facebook understands itself as a form of core infrastructure in nation-states, what responsibilities infrastructural companies have to prevent or foresee harms, whether it can be reasonably argued that the infrastructure itself facilitates or enables harms, and whether Facebook's efforts to promote digital literacy and increase awareness of community standards demonstrated sufficient effort to mitigate them.

Assuming that the laws currently on the books aren't being used or can't be used to hold companies accountable, what potential laws could? Approaches in the United States and Germany are more focused on specific platform dynamics in those countries—campaign-advertising disclosure or heavy fines for failing to take down hate speech.

As the director of the Dangerous Speech Project, the American University adjunct associate professor Susan Benesch understands the common reflex to try to use law to regulate online content—or to force platforms to do it—but believes there are a lot of good reasons for caution. For one thing, Benesch argued, laws against specific kinds of speech tend to be more often used against the marginalized than the

powerful. For another, enforcement of censorship laws tends to be overzealous, especially when censorship is outsourced by governments to private actors.

Benesch doubts that Facebook or any other company has software sophisticated enough to automate the kind of nuanced comprehension needed to understand the harms of specific kinds of speech in a variety of social contexts, and would be likely to take down too much content. "Laws that compel people to do things exert enormous pressure toward overregulation. The software just isn't ready to effectively discern at scale."

Cynthia Wong at Human Rights Watch also expressed skepticism. "The challenge is that in many countries, governments themselves are part of the problem [of hate speech]. So the government is using Facebook to spread misinformation and hate speech against minorities. It's not something you can lay completely at the feet of Facebook—it's not their job to fix what governments are doing."

Facebook's actual job is serving their shareholders, which usually means getting more people on Facebook and selling more advertisements. Like most platforms, it prefers self-regulation and making promises to be a better actor over government regulation that might undermine that primary mission. But Benesch also pointed out that Facebook's public-facing community standards for content moderation are pretty vague ("just like the Constitution," she cheerfully noted) and their internal guidelines for content moderation are generally opaque (or were, until someone leaked them to ProPublica). It's the vagueness of those policies that leads moderators to flag posts documenting Burmese military actions while misinformation continues to be posted by the ultranationalist Buddhist monk Ashin Wirathu, who was banned from publicly preaching in Myanmar because the vitriolic nature of his speech was fueling ethnic cleansing.

To be clear, it's not as though anyone has publicly stated they want to sue Facebook over its actions or inactions in Myanmar—as reporting from this past fall indicated, most activists and Muslims in the country are more concerned with the state enacting or passively letting violence spread than the platform, though there's definitely a desire to see Facebook do more and be more responsive and attentive.

The reason to seek out a legal context for the company's actions is because at the end of the day Facebook's track record of being actually shamed into action by moral outcry is pretty weak, and in its idealized form law might be where such outcry can bear regulatory or financial consequence that might actually force the company to act. The reason to follow these legal dead ends to their utmost conclusion is to recognize that the formal and informal tools available (and the ones being proposed) are pretty ill-equipped for the actual task at hand.

To leave the power to regulate speech in the hands of a self-regulating Facebook has proven untenable for preventing harm; to re-situate that power with government is an easy recipe for perpetuating it. In both cases, power and agency remain out of the hands of the citizens directly impacted by these systems. And while Facebook promotes its work with civil society and governments to improve digital literacy and content moderation in countries around the world, these efforts are a cold comfort to people who have already lost their homes, families, and livelihoods—which, again, is not directly due to Facebook but is a reality they're implicated in. Piecemeal additions of flagged terms and hiring more moderators to make dire judgement calls is better than nothing, but dwarfed by the scale and complexity of the problem.

Facebook acting as an unwitting propaganda engine for ethnic cleansing (or at best knowingly trying, but still failing, to avoid being a propaganda engine) is perhaps the worst-case scenario of a larger systemic problem of the ease with which platforms can be manipulated in the service of hate speech and misinformation. How many more tragedies like it can societies afford while platforms work toward the promise of nuanced content moderation operating at the same scale as content propagation?

The option of Facebook simply ceasing operations in areas where their platform is manipulated to enable human-rights abuses also seems an unsatisfying outcome. As Jonathan Zittrain of Harvard's Berkman Klein Center for Internet & Society put it, "[Facebook] abdicating feels weird because quite often (and this is sometimes reflected in the law) if you're in a position to do something, to alleviate a great harm

—and you're profiting, you're not a bystander, you're implicated or involved—we tend to think you have a responsibility to do something." But no one can really agree about the "something" to be done. Zittrain compared it to the automotive industry: Instead of asking for a recall on defective cars that are known to cause crashes, "if a company could repair the car as it's crashing—that's what Facebook is being asked to do. Though tweaking speech on the fly, of course, has implications beyond improving product safety."

To their credit, Facebook does seem to understand that it has a responsibility to address manipulation on the platform, and to its users in Myanmar, regardless of the fact that tensions between Rohingya Muslims and Buddhist nationalists have existed long before their market presence. "We are humbled by the many ways we see people use Facebook in Myanmar. Maintaining a safe community for people to connect and share on Facebook is absolutely critical to us," Budhraja responded when asked if Facebook believes they have a responsibility to address manipulation of the platform in settings where state-supported human-rights abuses are taking place.

But when asked how the company frames that responsibility—as a moral, ethical, legal, or business concern—Facebook had no on-the-record response. The company's public language of "open platforms" and "social infrastructure" to support sharing make for great Zuckerberg chestnuts, but like many other major tech platforms the company doesn't seem capable of openly reckoning with or articulating what it means to be a powerful political actor in a major conflict—and this might have something to do with the fact that the only real consequences they face are bad PR and not loss of market share or legal liability.

The incoherence of platforms' response to their very real public harms and the lack of imagination in accountability mechanisms might explain the doomed appeal of crafting a single coherent legal charge, something piercing and fixed like a diamond wrested from coal.

The pursuit of a legal frame speaks to a naïve hope (against all rational understanding of humanity's irrational tendencies, against the absurdity of law

itself) that if we can just construct a shared story of What Happened and Who's Responsible, perhaps we will find words that give clarity to the pain of unspeakable things and perhaps we'll stop those things from happening again. Of course, clarity isn't necessarily justice either—the Kuala Lumpur War Crimes Tribunal may have convicted Tony Blair and George W. Bush for war crimes, but those convictions might be better understood as a critique of a human-rights law regime largely constructed by Western powers who rarely, if ever, have to be held to account for their own crimes. Which maybe points to the further absurdity of asking how to hold Facebook accountable for negligence or complicity in its foreign markets: In a time when the United States can barely come to terms with its own foundational legacy of genocides and crimes against humanity, how can anyone even begin to pursue accountability or reparations for the passive programmatic violence enabled by a single company operating abroad?

Yet to simply point at the unintentional automated wreckage or demand piecemeal repairs to the monstrous machinery of platforms feels like giving in to the fatigue and sorrow of a vacuous world in which everyone is sorry and no one is responsible. It is exhausting to live in a time when power is not only something companies abuse but a force inadvertently unleashed by well-intentioned engineering teams, as pure and innocent as Pandora faced with an irresistible box of technical puzzles or (depending on the particular hubris of the company in question) as benevolent as Pandora's doomed brother-in-law Prometheus, simply trying to bring lowly mortals treasures that they were wholly unprepared to wield. What laws can punish the innovation—nay, the generosity—of endowing the world with such accursed gifts? So we throw up our hands and post our discontent, we mourn, we attend to the next crisis, and the next, and the next, and the next. We muddle through knowing that the gods of Silicon Valley are doing the best to tame monsters of their own conjuring, but can neither contain nor answer for continued collateral damage.

But at the end of the day, the corporate campuses of Menlo Park and Mountain View hold neither gods nor monsters. They hold merely, mostly, men—men who, for now, primarily answer to a court of public opinion for the violence and horror their platforms repeatedly enable. Men who will wax poetic about "community"

and "social infrastructure" while essentially building a plausibly deniable advertising engine. Men who are, as they are in so many other sectors of public life right now, due for a real reckoning with real consequences.

## Related Video

ABOUT THE AUTHOR



**INGRID BURRINGTON** writes about computers, politics, and art, and has been published in *The Atlantic, The Nation, ProPublica, San Francisco Art Quarterly, Dissent*, and elsewhere. She lives in Brooklyn.

Twitter

# EXHIBIT 20

THE
NEW YORKER

# THE DEVASTATING SHUTDOWN OF THE CAMBODIA DAILY

**By Thomas Beller**   September 12, 2017



*The newspaper was staffed by a handful of Westerners and Khmers, but it became an essential part of the fabric of the country over nearly a quarter century.*

Photograph by Pring Samrang / Reuters

I n the summer of 1994, I got off a plane in Phnom Penh, Cambodia, and took a taxi to the offices of the *Cambodia Daily*. I had made a deal with the newspaper's publisher, Bernard Krisher, to contribute occasional pieces in exchange for room and board in a villa dubbed "Medical House," so named because Krisher aspired to start a hospital in addition to the newspaper, which he had been publishing for about a year. I had been put up to this adventure by a friend, and my contact with Krisher involved a couple of faxes followed by a brief phone call, much of which was spent discussing

what I should pay the taxi-driver for the ride from the airport to the newspaper's offices, in the Renakse Hotel, across from the Royal Palace.

"It should cost five dollars," he said. "Agree to five dollars beforehand. He's going to ask you for more at the end, but don't pay more than five dollars." Krisher returned to this point again before our short conversation came to a close.

I had been too young to have any awareness of the Vietnam War while it was waged, but I was the right age for Vietnam War movies. As my plane descended toward Phnom Penh, I looked down at the verdant landscape of palm trees, rice paddies, and jungle and felt as though I were arriving into the last reel of "Apocalypse Now." When I later read Joan Didion's account, in "Salvador," of a writer who goes to a country at war and can't leave the hotel room for a long period of time, I thought back to my early days in Phnom Penh.

I came down the steps onto the tarmac. The heat disoriented me. I got my suitcase in a terminal that could have been mistaken for a small-town bus station. Then I chose a taxi-driver from among a throng waiting at the curb. We agreed on the price of five dollars in advance.

My driver was slender, with thick black hair combed back in something almost resembling a pompadour. His English was rudimentary, but he asked where I was from and tried to be agreeable as he guided his Toyota Corolla down the main road into the capital. Mopeds, pedestrians, and bicycles crowded the road, along with the occasional oxcart. I saw families of four piled onto a single moped, sometimes with cargo laid across the driver's lap—produce or dead livestock, such as chickens or a pig. Eventually, we arrived in the city. There were broad boulevards, and soon we were driving along the long yellow wall of the Royal Palace. We turned into the lush driveway of the Renakse Hotel. The driver then asked me for ten dollars.

"We agreed on five," I said.

"Please, sir," he said. "My whole family was killed in Pol Pot time."

"We agreed on five," I said.

"Please, sir," he said. "My mother was killed. My sister."

"We agreed on five."

"Please, sir. My brother was killed in Pol Pot time. My father."

"Yes, but we agreed on five dollars," I said.

We went back and forth like this for a while. I held out. I stayed strong.

In the end, I gave him ten. I felt ashamed both for caving and for holding out.

I went upstairs to the hotel's attic and pressed my face to the glass doors of the *Cambodia Daily*. No one was in the office. It was a Saturday. I sat for a long time outside in the hallway, with the toneless rhythm of the driver's refrain ringing in my ears.

I have thought about this strange episode on and off ever since, wondering why Krisher made such a production about the five dollars. The narrow, verifiable explanation is that Krisher was a micromanager, and at times very tight with a dollar. But I am sure that, intuitively, he knew this interaction would provoke some necessary reckoning.

The encounter would, perhaps, deliver the news that you had to assimilate many realities at once to function in this environment. That you walked on the dust of hundreds of thousand of skulls as you went about your business in the city. That you were participating in an experiment, courtesy of the United Nations, of creating a democracy from scratch. That you would write for a newspaper whose motto was "All the news without fear or favor," and which would look as flimsy as a mimeographed student newspaper. A newspaper that was staffed by a handful of Westerners and Khmers but became an essential part of the fabric of the country over nearly a quarter century.

VIDEO FROM THE NEW YORKER

The Man Who Shazamed the World

I thought about that taxi-driver exchange again, ten years later, when I reviewed a book, "Cambodia: Report from a Stricken Land," for the *Daily*. The author, Henry Kamm, had been reporting on Southeast Asia for the *Times* for decades, and the book was full of personal anecdotes. In 1980, just after the horrible genocide of the Khmer Rouge regime, Kamm visited Youk Kun, the only person working at the National Library:

> "He was rearranging the few books
> that the Khmer Rouges had left, so
> that the humble colonial building
> would again deserve the high
> flown title engraved on its facade. I
> asked what food rations he
> received for himself and his family.
> His voice neither rose nor fell
> when he answered quietly, 'My
> wife and six children were killed by
> Pol Pot.' 'Killed by Pol Pot,' in
> French or English or the voice of
> my interpreter, still resounds in my

ears many years later. I dreaded the
moments in conversation when
once again the fatal phrase became
suddenly unavoidable."

In late August this year, the news arrived that the *Daily* was being threatened with closure—the finance ministry had presented the publishers with a spurious tax bill of over six million dollars, and the paper was given two weeks to pay it or shut down. The government had also threatened fifteen radio stations with shutdowns unless they stopped broadcasting Voice of America and Radio Free Asia. N.D.I., a pro-democracy N.G.O., was told to shutter its operations. Most ominously, Hun Sen, the strongman ruler of Cambodia for the last thirty years, gave a press conference in which he labelled the *Cambodia Daily* the "chief thief."

The situation, for me, immediately took on the emotional rhythm of a hostage negotiation, perhaps because kidnappings were a major theme during my time in Cambodia. Was this a threat or a bluff? A way of leveraging the concession of some painful but manageable sum? Was it a warning shot to the *Daily* in advance of the national elections, meant to suggest moderation of any criticism of Prime Minister Hun Sen and his C.P.P. party? "This is clearly a tax bill that is not meant to be paid but whose purpose is to close down the *Cambodia Daily*," said Deborah Krisher Steele, Bernie's daughter and now the newspaper's publisher. As has been pointed out in many quarters, this authoritarian crackdown has more than one source. There is the rise of Chinese influence in Cambodia, and the waning of Western money and attention. And then, as Eric Pape, a former *Daily* reporter, wrote in the Daily Beast, there is the fact that the violent rhetoric against the free press by President Trump has now had a ripple effect in faraway Cambodia.

The days ticked down to the Monday, September 4th, deadline. There were many news items about the threat to the *Daily* and the authoritarian turn away from democracy. On Sunday, September 3rd, the leader of the opposition party was arrested in the middle of the night, charged with treason, and taken to a remote prison. The following edition of the paper carried the headline "Descent into outright dictatorship," above the fold. At the bottom was an article titled "Cambodia Daily faces immediate closure amidst threats." That was the last issue.

It has been some consolation, in trying to find words for what the closure of the *Daily* means, to have the words of multiple alumni of the newspaper to consult as they eulogize it. Molly Ball, who now covers politics for *The Atlantic*, wrote in a series of tweets, "The crisis of Cambodian democracy is the important thing here, not some expats' tender feelings. But . . . Living & doing journalism in Cambodia, as I did from 2001-2003, forever changed the way I see the world. In particular, I didn't really understand the rule of law until I lived in a place where it was a novel & precarious thing. Writing about war-crimes tribunals & development issues was a thrill. But also taught me how much Americans take for granted."

Ethan Plaut, who has recently completed a Ph.D. at Stanford, wrote:

> "The Cambodia Daily was too young, at 24 years and 15 days of age, to find its end today at the hands of authoritarian thugs. But damn the Daily burned hot while it lasted. Six nights a week, the Daily was up late, sweating over every misplaced comma in the apparently endless list of things that happened that day, and every day: forests destroyed, refugees in hiding, soldiers run amok, women enslaved, government officials going about business as usual, such as it was, and is . . . The paper itself, as a physical object, was perhaps loveliest at its most dubious, when it was found in photocopy-bootleg editions, being resold by street children or draped over a motodop's face to block the afternoon sun for a nap."

Fergal Quinn, writing in the *Irish Examiner*, may have captured the most admirable aspect of the whole enterprise, which is the role the paper played in the working lives

of Khmer journalists:

> "I happily dived into the peculiarly fecund atmosphere you get in a newsroom which combined ambitious, hungry but green young journalists from the US and Europe and a much more experienced local staff who were utterly convinced of their journalistic mission . . . They were glad of the help and the layer of protection that they believed foreigners afforded them as they poked and prodded at those in power . . . The same theme emerged from conversations this week with Daily alumni, many of whom went onto careers with the likes of Reuters, The Associated Press and the New York Times. A profoundly-felt well of respect for the Cambodian colleagues who did their job day in day out, with much greater chance of punishment than we did and much less chance of a significant reward. Those Khmer reporters truly, madly, utterly believed that telling the truth and shining a light on corruption would inevitably change their corner of the world for the better."

One example of this reporting is a story from 2012. Two *Daily* journalists accompanied the anti-logging activist Chut Wutty, the founder of the Natural Resources Protection Group, to the Cardamom Mountains. When several soldiers approached Wutty, he got in his car and tried to flee. Eventually, he was shot and killed in the car, but not before

trying to start it. The car wouldn't start. The journalists from the *Daily* present at the scene were briefly under the impression that they would be shot, too. They heard one of the soldiers say, "Just kill them both."

The story ran in the *Daily* the next day without a byline; the reporters were too traumatized to write it themselves. I called one of those reporters, Bopha Phorn, who is now on a Hubert H. Humphrey journalism fellowship at Arizona State University. "The closing of the *Daily* is like the slaughter of a big part of democracy in Cambodia," she said. "It is like the beheading of an institution where journalists could go learn journalism and practice it. It's devastating. It's bigger than what you think." I asked her about the piece that was published in the *Daily*. "I couldn't write the piece myself. I dictated it because I was crying so hard. Someone had to keep asking me questions. They kept saying, 'You have to say what you saw and what you heard. It's important.'"

*Thomas Beller's books include "Seduction Theory," "The Sleep-Over Artist," and "J.D. Salinger: The Escape Artist," which won the New York City Book Award for biography/memoir.* *Read more »*

## Video



# EXHIBIT 21

 **UN News** Centre
with breaking news from the UN News Service

## UN rights chief voices concern about Cambodia election after opposition ban

17 November 2017 – The United Nations human rights chief voiced grave concerns Friday about the conduct of credible, free and fair elections in Cambodia next year following the decision by the Supreme Court to dissolve the main opposition party.

"An effective multi-party democracy requires an opposition that can operate freely without intimidation and threats – and the same goes for a credible, free and fair election," said UN High Commissioner for Human Rights Zeid Ra'ad Al Hussein in a news release.

The court dissolved the Cambodian National Rescue Party (CNRP), the main opposition party, on Thursday after the Ministry of Interior complained that the opposition was plotting a so-called colour revolution against the Government. A total of 118 CNRP members were banned from political activity for five years.

"People need to be able to debate and discuss freely the political affairs of their country, and the decision to dissolve the CNRP has deprived over three million voters of their representation," Mr. Zeid said.

The party's dissolution follows the arrest on 3 September of CNRP president Kem Sokha on charges of 'treason' related to comments made in 2013 about his grassroots political strategy to challenge the current Government.

"The use of law against the CNRP and its members is a smokescreen – it is the rule by law, and not the rule of law. The accusations against the CNRP and its members were vague, as were the legal provisions supporting the complaint to dissolve it," Mr. Zeid said, adding the dissolution of the CNRP was based on alleged criminal acts by Kem Sokha which had not been proved in a court of law.

Mr. Zeid said the party's dissolution and the ban on its members was all the more worrying, given other measures by the Government in recent months, including closure and suspension of civil society groups as well several media companies. It has also been targeting individual journalists and members of non-governmental organizations.

"An essential component of all democracies is a vibrant civil society, including NGOs and press that may sometimes be critical of the Government," said Mr. Zeid. "Imposing limits on civil society and shrinking their space serves only to stymie the creativity, innovation and ingenuity necessary for Cambodia to continue to develop, and to maintain peace."

Similarly, he stressed, "a free press is essential to ensure that the public is properly informed of political and other issues so that people can be responsible and engaged actors."